1  LAW OFFICES OF DALE K. GALIPO
   Dale K. Galipo, Esq. (SBN 144074)
2  dalekgalipo@yahoo.com
   Hang D. Le, Esq. (SBN 293450)
3  hlee@galipolaw.com
   21800 Burbank Boulevard, Suite 310
4  Woodland Hills, CA  91367
   Telephone:   (818) 347-3333
5  Facsimile:   (818) 347-4118

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JAMES WRIGHT,                          | Case No. 5:24-cv-01123-JLS-JC

12                Plaintiff,               | **SECOND AMENDED COMPLAINT FOR DAMAGES**

13         vs.

14                                         1. Unreasonable Search and
    COUNTY OF SAN BERNARDINO;                 Seizure—Detention and Arrest (42
15  and DOES 1-10, inclusive,                 U.S.C. § 1983)
                                           2. Unreasonable Search and
16                Defendants.                  Seizure—Excessive Force (42
                                              U.S.C. § 1983)
17                                         3. Unreasonable Search and
                                              Seizure—Denial of Medical Care
18                                            (42 U.S.C. § 1983)
                                           4. Municipal Liability – Inadequate
19                                            Training (42 U.S.C. § 1983)
                                           5. Municipal Liability –
20                                            Unconstitutional Custom or Policy
                                              (42 U.S.C. § 1983)
21

22                                         **DEMAND FOR JURY TRIAL**

23

24

25

26

27

28

## **COMPLAINT FOR DAMAGES**

JAMES WRIGHT brings this Complaint against Defendants COUNTY OF SAN BERNARDINO, and DOES 1-10, inclusive, and hereby alleges as follows:

## **INTRODUCTION**

1.     This civil rights and state tort action seeks compensatory and punitive damages for serious physical injuries sustained by Plaintiff JAMES WRIGHT ("WRIGHT" or "Plaintiff") as a result of force used against him by County of San Bernardino Sheriff's Deputies on June 7, 2022.  The use of force was excessive and unreasonable because WRIGHT posed no immediate threat to any person and was unarmed at the time the use of force.  As a result of the officers' use of force, WRIGHT endured pain and suffering and sustained serious physical injuries. WRIGHT also experienced and continues to experience emotional distress from the incident and the physical injuries he sustained. Also, as a result of the use of force, WRIGHT has incurred medical expenses, has lost earnings, has suffered a reduced earning capacity, and expects to incur future medical expenses and lose future earnings.

## **JURISDICTION AND VENUE**

2.     This case arises under 42 U.S.C. § 1983 and 1988 as well as California law.  This court has subject matter jurisdiction over Plaintiff's federal question and civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over Plaintiff's supplemental state law claims under 28 U.S.C. § 1367 as those claims arise out of the same transactions and occurrences as Plaintiff's federal question claims.

3.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because all incidents, events, and occurrences giving rise to this action occurred in the City and the County of San Bernardino, California.

# **PARTIES**

4.     At all relevant times, Plaintiff JAMES WRIGHT was and is an individual residing in the City of Encino, California.

5.     At all relevant times, Defendant COUNTY OF SAN BERNARDINO ("COUNTY") is and was a municipal corporation existing under the laws of the State of California. COUNTY is a chartered subdivision of the State of California with the capacity to be sued. COUNTY is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the San Bernardino County Sheriff's Department ("SBSD") and its agents and employees.  At all relevant times, Defendant COUNTY was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the and its employees and agents complied with the laws of the United States and of the State of California.  At all relevant times, COUNTY was the employer of Defendants DOE DEPUTIES.

6.     At all relevant times, Defendants DOES 1-5 ("DOE DEPUTIES") are deputies for SBSD who were acting under color of law within the course and scope of their duties as deputies for the SBSD.  DOES 1-5 were acting with the complete authority and ratification of their principal, Defendant COUNTY.

7.     Defendants DOES 6-10 are managerial, supervisorial, and policymaking employees of SBSD, who at all relevant times was acting under color of law within the course and scope of their duties as managerial, supervisorial, and policymaking employees for the SBSD. DOES 6-10 was acting with the complete authority and ratification of their principal, Defendant COUNTY.

8.     On information and belief, at all relevant times DOES 1-10 were residents of the County of San Bernardino.

9.     In doing the acts and failing and omitting to act as hereinafter described, DOE DEPUTIES were acting on the implied and actual permission and consent of DOES 6-10 and the COUNTY.

10.     In doing the acts and failing and omitting to act as hereinafter described, Defendants DOES 6-10 was acting on the implied and actual permission and consent of the COUNTY.

11.     The true names and capacities, whether individual, corporate, association, or otherwise of Defendants DOES 1-10, inclusive, are unknown to Plaintiff, who otherwise sues these Defendants by such fictitious names.  Plaintiff will seek leave to amend this complaint to show the true names and capacity of these Defendants when they have been ascertained.  Each of the fictitiously-named Defendants is responsible in some manner for the conduct or liabilities alleged herein.

12.     At all times mentioned herein, each and every Defendant was the agent of each and every other Defendant and had the legal duty to oversee and supervise the hiring, conduct, and employment of each and every Defendant.

13.     All of the acts complained of herein by Plaintiff against Defendants were done and performed by said Defendants by and through their authorized agents, servants, and/or employees, all of whom at all relevant times herein were acting within the course, purpose, and scope of said agency, service, and/or employment capacity.  Moreover, Defendants and their agents ratified all of the acts complained of herein.

14.     All Defendants who are natural persons, including DOES 1-10, are sued individually and in their official capacities as officers, sergeants, captains, commanders, supervisors, and/or civilian employees, agents, policy makers, and representatives for their respective principal, COUNTY.

15.     Plaintiff suffered injuries as a direct and proximate result of the actions DOE DEPUTIES.

SECOND AMENDED COMPLAINT FOR DAMAGES

## **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

16.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 15 of this Complaint with the same force and effect as if fully set forth herein.

17.    On June 7, 2022, Plaintiff WRIGHT was driving his vehicle when DOE DEPUTIES initiated a traffic stop on Plaintiff WRIGHT and his vehicle. Plaintiff WRIGHT pulled over near the intersection of Bear Valley Road and Hesperia Road in Victorville, California. On information and belief, Plaintiff WRIGHT had not committed any traffic infraction or any crime at the time DOE DEPUTIES initiated the traffic stop. On information and belief, DOE DEPUTIES had no reasonable suspicion to detain or probable cause to arrest Plaintiff WRIGHT.

18.    Once Plaintiff WRIGHT pulled over, DOE DEPUTIES issued several commands to WRIGHT. Plaintiff WRIGHT had his hands on the steering wheel pursuant to commands and was following DOE DEPUTIES' commands when he was shot at and struck by lethal and less-lethal rounds.

19.    At all relevant times, Plaintiff WRIGHT did not pose an immediate threat to the safety of DOE DEPUTIES or others. Plaintiff WRIGHT was unarmed and following DOE DEPUTIES' commands when he was shot at and struck by lethal and less-lethal rounds.

20.    After Plaintiff WRIGHT was shot at and struck by lethal and less-lethal rounds, DOE DEPUTIES handcuffed WRIGHT and held him prone against the ground, with DOE DEPUTIES' knees on WRIGHT's back for a prolonged period of time.

21.    After Plaintiff WRIGHT was seriously injured by being shot at and struck by lethal and less-lethal rounds, Plaintiff WRIGHT was denied prompt medical attention.  The delay of medical care to Plaintiff WRIGHT caused him extreme physical and emotional pain and suffering and contributed to his damages.

22.     As a result of the use of excessive force, Plaintiff WRIGHT sustained serious physical injuries and has incurred financial loss and expenses in the form of past and future loss of earnings, decreased earning capacity, and past and future medical expenses. Also as a result of this incident, Plaintiff WRIGHT has endured pain and suffering and emotional and mental distress stemming from the physical injuries.

## **FIRST CLAIM FOR RELIEF**

**Unreasonable Search and Seizure—Detention and Arrest (42 U.S.C. § 1983)**

(Against Defendants DOE DEPUTIES)

23.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 22 of this Complaint with the same force and effect as if fully set forth herein.

24.     Defendants DOE DEPUTIES had no objectively reasonable or specifically articulable factual basis to suspect that Plaintiff was involved in the commission of any crime, nor did Defendants DOE DEPUTIES have any confirmation that Plaintiff had committed any crime, posed any threat to anyone, and did not see Plaintiff in possession of any illegal objects, contraband, or weapons.

25.     Defendants DOE DEPUTIES detained Plaintiff without reasonable suspicion and arrested him without probable cause by pulling Plaintiff over, striking Plaintiff's body with lethal and less-lethal rounds, shooting at Plaintiff, and holding Plaintiff prone on the ground while exerting weight and force on Plaintiff's back for a prolonged period of time. The scope and manner of Defendants DOE DEPUTIES' detention and arrest of Plaintiff was unreasonable.

26.     The conduct of Defendants DOE DEPUTIES violated Plaintiff's right to be secure in his person against unreasonable searches and seizures as guaranteed

to Plaintiff under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

27.    The conduct of Defendants DOE DEPUTIES was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff and therefore warrants the imposition of exemplary and punitive damages as to Defendants DOE DEPUTIES.

28.    As a result of their misconduct, Defendants DOE DEPUTIES are liable for Plaintiff's injuries, either because they were integral participants in the unreasonable seizure or because they failed to prevent these violations.

29.    Plaintiff seeks compensatory damages and attorney's fees under this claim.

## SECOND CLAIM FOR RELIEF

**Unreasonable Search and Seizure—Excessive Force (42 U.S.C. § 1983)**

(Against Defendants DOE DEPUTIES)

30.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 29 of this Complaint with the same force and effect as if fully set forth herein.

31.    DOE DEPUTIES and DOE OFFICERS used excessive and unreasonable force when they struck Plaintiff with lethal and less-lethal rounds, shot at Plaintiff, and held Plaintiff prone against the ground while applying force and weight to Plaintiff's back. Defendant DOE DEPUTIES' unjustified use of force deprived Plaintiff of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Plaintiff under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

32.    At all relevant times, Plaintiff did not forcibly resist nor did he pose an immediate threat to the safety of DOE DEPUTIES or anyone else.

33.    Defendants DOE DEPUTIES' use of force was excessive and objectively unreasonable and contrary to basic police officer training because Plaintiff posed no immediate threat to the safety of any person at the time.

34.    Defendants DOE DEPUTIES did not exhaust all reasonable available alternative measures prior using force on Plaintiff. Defendants DOE DEPUTIES failed provide adequate commands and warnings prior to using force, despite it be feasible to do so.

35.    Plaintiff suffered serious and permanent physical injuries as a result of the use of force.

36.    At all relevant times, Defendants DOE DEPUTIES were acting under color of state law.

37.    As a result of their misconduct as described above, Defendants DOE DEPUTIES are liable for Plaintiff's injuries, either because they were integral participants in the use of excessive force or because they failed to prevent these violations.

38.    The conduct of Defendants DOE DEPUTIES was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff and therefore warrants the imposition of exemplary and punitive damages as to Defendants DOE DEPUTIES.

39.    Plaintiff seeks compensatory damages for the violations of his rights, including damages for past and future medical expenses, past and future loss of earnings and decreased earning capacity, physical injuries, past and future pain and suffering, emotional and mental distress stemming from the physical injuries, humiliation, and disfigurement.  Plaintiff also seeks punitive damages, costs, and attorney's fees under this claim.

//

//

//

**THIRD CLAIM FOR RELIEF**

**Unreasonable Search and Seizure—Denial of Medical Care (42 U.S.C. § 1983)**

(Against Defendants DOE DEPUTIES)

40.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 39 of this Complaint with the same force and effect as if fully set forth herein.

41.     After the detention, arrest, and use of force, Plaintiff was denied prompt medical attention while he was seriously injured and in pain. The delay of medical care to Plaintiff caused him extreme physical and emotional pain and suffering and contributed to his damages.

42.      The denial of medical care by Defendants DOE DEPUTIES deprived Plaintiff of his right to be secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

43.     The delay in medical attention contributed to Plaintiff's pain and suffering and was a contributing cause of Plaintiff's injuries and his mental and emotional distress.

44.     Defendant DOE DEPUTIES knew that failure to provide timely medical treatment to Plaintiff could result in further significant injury or the unnecessary and wanton infliction of pain, but disregarded that serious medical need, causing Plaintiff great bodily harm.

45.     The conduct of Defendants DOE DEPUTIES was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff and therefore warrants the imposition of exemplary and punitive damages as to DOE DEPUTIES.

46.     At all relevant times, Defendants DOE DEPUTIES were acting under color of state law.

SECOND AMENDED COMPLAINT FOR DAMAGES

47.    As a result of their misconduct as described above, Defendants DOE DEPUTIES are liable for Plaintiff's injuries, either because they were integral participants or because they failed to prevent these violations.

48.    Plaintiff seeks compensatory damages for the violations of his rights, including damages for past and future medical expenses, past and future loss of earnings and decreased earning capacity, physical injuries, past and future pain and suffering, emotional and mental distress stemming from the physical injuries, humiliation, and disfigurement.  Plaintiff also seeks punitive damages, costs, and attorney's fees under this claim.

## FOURTH CLAIM FOR RELIEF

### Municipal Liability – Inadequate Training (42 U.S.C. § 1983)

(Against Defendants COUNTY and DOES 6-10)

49.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 48 of this Complaint with the same force and effect as if fully set forth herein.

50.    At all relevant times, Defendants DOE DEPUTIES were acting under color of state law.

51.    The acts of Defendants DOE DEPUTIES deprived Plaintiff of his rights under the United States Constitution.

52.    The training policies of Defendant COUNTY were not adequate to train its officers to handle the usual and recurring situations with which they must deal.

53.    Defendant COUNTY was deliberately indifferent to the obvious consequences of its failure to train its police officers adequately.  Specifically, COUNTY failed to adequately train DOE DEPUTIES with respect to detentions and arrests, tactics, use of less-lethal options, and the use of deadly force, including

determining whether the use of force and deadly force is reasonable and appropriate under the circumstances.

54.    The negligent and unjustified use of force by DOE DEPUTIES was a result of the negligent training by the Defendants COUNTY and DOES 6-10, who failed to train COUNTY deputies as to proper police tactics, proper use of force, proper use of deadly force, and proper detention and arrest procedures. The Defendant COUNTY and DOES 6-10 were responsible for the training of COUNTY deputies to ensure that the actions, procedures, and practices of said Defendants complied with Peace Officer Standards and Training (POST) training standards regarding proper police tactics, and proper use of deadly force.

55.    The Defendants COUNTY and DOE DEPUTIES negligently failed to train COUNTY deputies to comply with POST training standards regarding proper police tactics, proper use of force, proper use of deadly force, and proper detention and arrest procedures. POST was established by the California Legislature in 1959 to set minimum training standards for California police officers. The training policies of COUNTY were not adequate to train its police officers to handle the usual and recurring situations with residents that said Defendants have contact with.

56.    The training policies of the COUNTY were deficient in the following ways:

(a)    COUNTY failed to properly train COUNTY sheriff's deputies so that deputies do not escalate their interactions with residents and do not overreact and resort to use of force or deadly force when the use of force was not necessary.

(b)    COUNTY failed to properly train COUNTY sheriff's deputies so that Defendants do not permit fear to reach the point of becoming unreasonable fear, and not objectively reasonable, which would result in the use of force to cause that would cause serious injuries to residents, such as Plaintiff. This was a part of

1    COUNTY negligent failure to train DOE DEPUTIES to properly

2    and adequately assess the need to use force against Plaintiff.

3    (c)    COUNTY failed to properly train COUNTY failed to properly

4    train COUNTY sheriff's deputies, such as DOE DEPUTIES, in

5    proper police tactics, such as situational awareness so that

6    sheriff's deputies do not utilize negligent tactics, such as DOE

7    DEPUTIES herein. Because of this lack of proper training by

8    COUNTY, DOE DEPUTIES did not use proper police tactics in

9    handling of the contact with Plaintiff, and instead used defective

10    police tactics, including the lack of a situational awareness.

11    These defective tactics resulted in serious injuries to Plaintiff.

12    (d)    COUNTY failed to properly train COUNTY sheriff's deputies,

13    such as DOE DEPUTIES, in the importance of effective

14    communication prior to using force.

15    (e)    Because of the lack of proper training by COUNTY, DOE

16    DEPUTIES did not use effective communication prior to and

17    during the use of force against Plaintiff. The ineffective

18    communication of information by DOE DEPUTIES prior to, and

19    during the incident, resulted in serious injuries to Plaintiff.

20    57.    The failure of Defendant COUNTY to provide adequate training caused

21    the deprivation of Plaintiff's rights; that is, Defendant COUNTY's failure to train is

22    so closely related to the deprivation of Plaintiff's rights as to be the moving force

23    that caused the ultimate injury.

24    58.    The following are only a few examples of continued conduct by

25    sheriff's deputies working for the County of San Bernardino, which indicate the

26    County of San Bernardino's failure to properly train its sheriff's deputies:

27    (a)    In *V.R. v. County of San Bernardino, et al.*, case number 5:19-cv-

28    01023-JGB-SP, Plaintiffs argued that the use of less-lethal and

1   lethal munitions against decedent, Juan Ramos, was

2   unreasonable and excessive. Prior to the uses of force, officers

3   had responded to a call for reckless driving and had engaged in a

4   vehicle pursuit with Mr. Ramos. The pursuit ultimately ended in

5   a dead-end street where officers attempted to extract Mr. Ramos

6   out of his vehicle. The officers had information that Mr. Ramos

7   was in possession of an edged weapon. The officers broke the

8   vehicle's front passenger window. When Mr. Ramos

9   momentarily exited the vehicle, the officers deployed three

10   beanbag rounds at him and Mr. Ramos reentered his vehicle. A

11   few seconds later, Mr. Ramos exited his vehicle and ran away

12   from the vehicle and officers with the edged weapon in his hand.

13   As he was running in the direction of some civilians in a nearby

14   front yard, an officer shot at Mr. Ramos in the back. Prior to the

15   shooting, Mr. Ramos had not tried to attack anyone or stab

16   anyone with the edged weapon. In 2022, a jury returned a $4.5

17   million verdict against Defendant County of San Bernardino and

18   its involved deputies.

19   (b)   In *M.A., et al. v. County of San Bernardino*, Case No.: 8:20-cv-

20   00567-JFW-SHK, C.D. Cal., plaintiffs alleged that the 2019 fatal

21   shooting of Darrell Allen, Jr. was excessive and unreasonable

22   when deputies intentionally shot Mr. Allen several times without

23   warning. Deputies had responded to a domestic disturbance call

24   and was searching in the area of an apartment complex for Mr.

25   Allen. The deputies located Mr. Allen in the laundry room and

26   ordered Mr. Allen to exit the laundry room with his hands up. It

27   is believed that at some point, Mr. Allen was in possession of a

28   knife, but at the time of the shooting, Mr. Allen's hands were up,

open, and empty and Mr. Allen was facing away from the deputies. At no time prior to the shooting did it appear that Mr. Allen was going to attack or seriously injure the deputies. Mr. Allen was not an immediate threat of death or serious bodily injury. Two deputies were present at the time of the shooting, but one deputy claimed that he did not shoot. Despite several percipient witnesses indicating that they had seen both deputies shoot and there being a discrepancy in the number of bullets fired and the forensic evidence at the scene indicating that more shots had been fired than the weapon round count indicated, an investigator for COUNTY testified that he chose not to take the second deputy's gun into custody and did not do a bullet analysis on the second deputy's gun because the investigator did not want to disbelieve the second deputy or accuse him of lying. The Lethal Force Encounters ("LFE") Review Board makes recommendations to the Sheriff regarding whether the LFE was in policy, whether it was intentional or accidental, whether training and/or policy issues have been addressed appropriately, and whether to close the case pending the results of the District Attorney's review. The LFE Review Board sends the Sheriff a Findings and Recommendations Memorandum. The Sheriff reviews and ultimately approves the findings and recommendations. The shooting of Mr. Allen was found to be not out of policy. In 2021, the case settled for a seven-figure settlement. On information and belief, no deputy was retrained, provided additional training, disciplined, suspended, or terminated as a result of this incident.

SECOND AMENDED COMPLAINT FOR DAMAGES

1    (b) In *Brown v. County of San Bernardino*, case number 5:20-cv-

2       01658, Plaintiff alleged that San Bernardino County Sheriff's

3       Deputies used excessive and unreasonable force when they shot

4       him several times and when he never threatened any person with

5       a weapon or vehicle. Plaintiff was in a moving slow-moving

6       vehicle and no one, including any of the deputies, were in the

7       direct path of the vehicle when deputies shot numerous times

8       into the side of the vehicle. In 2021, the parties settled the case

9       for a high six-figure settlement. Upon information and belief, no

10      deputy was retrained, provided additional training, disciplined,

11      suspended, or terminated as a result of this settlement.

12    (c) In *Estate of Merlin Factor v. County of San Bernardino, et al.*,

13       case number 5:14-cv-01289-DMG-AGR(x), Plaintiffs argued

14       that the use of deadly force against the unarmed Merlin Factor

15       was unreasonable. Mr. Factor was a passenger inside a car that

16       had been pulled over. When a deputy opened the passenger door,

17       Mr. Factor stepped out and started to run away. The deputy

18       grabbed Mr. Factor's hand and Mr. Factor wrapped his arms

19       around the deputy. Another deputy tased Mr. Factor and then

20       yelled out "gun," even though Mr. Factor was unarmed. The

21       deputy who had tased Mr. Factor then shot at Mr. Factor while

22       Mr. Factor was halfway in the car. The police reports showed

23       that Mr. Factor was unarmed, and the parties settled the case for

24       a high six-figure settlement.

25    (d) In *Ranero v. County of San Bernardino*, Case No. 5:16-cv-

26       02655, C.D. Cal., the COUNTY settled with a man involved in a

27       non-fatal police shooting that resulted in serious injuries

28       including the loss of use of the victim's left leg. The deputies had

SECOND AMENDED COMPLAINT FOR DAMAGES

responded to a domestic disturbance call wherein Luis Ranero was barricaded inside the home. After some time had passed, Mr. Ranero exited the house and was given commands to show his hands. Mr. Ranero complied with commands to show his hands and brought his hands up, with one hand holding a yellow-colored bottle of Muscle Milk. Deputies shot at Mr. Ranero despite Mr. Ranero being unarmed, was complying commands at the time of the shooting, and was not posing a threat prior to or at the time of the shooting. The COUNTY ratified the deputies' conduct, finding the shooting to be "within policy," and failed to reprimand, retrain, or otherwise penalize the deputies for their conduct.

(e)    In *Archibald v. County of San Bernardino*, case number 5-16-cv-1128, Plaintiff argued that the involved San Bernardino County Sheriff's deputy used deadly force against the unarmed Nathanael Pickett when he posed no immediate threat. The deputy initially made contact with Mr. Pickett because Mr. Pickett looked at him while crossing a marked crosswalk at night. The deputy followed Mr. Pickett onto the grounds of a motel and attempted to detain Mr. Pickett, despite there being no reasonable suspicion to detain. Mr. Pickett refused to stop and continued to walk away from the deputy. The deputy pursued Mr. Pickett and as Mr. Pickett was attempting to get away, Mr. Pickett tripped and fell. While Mr. Pickett was on the ground, the deputy threatened to tase Mr. Pickett. The deputy then went hands-on with Mr. Pickett with the intention of handcuffing him. When Mr. Pickett resisted, the deputy struck Mr. Pickett several times and a struggled ensued as Mr. Pickett tried to get away.

-16-

1     While both were on the ground, with the deputy on top of Mr.
2     Pickett, the deputy pulled out his gun and shot and killed Mr.
3     Pickett. The jury in that case returned a $33.5 million verdict
4     against Defendant County of San Bernardino and the deputy. The
5     COUNTY ratified the deputy's conduct, found the detention and
6     shooting to be "within policy," and failed to reprimand, retrain,
7     or otherwise penalize the deputy for his conduct. The COUNTY
8     negligently retained the deputy following this shooting, which
9     resulted in a subsequent shooting by the same deputy of another
10    unarmed man, for which the COUNTY settled with the victim
11    prior to any litigation.

12    (f)    In *T.M. (Phillips) v. County of San Bernardino, et al.*, case
13    number 5:18-cv-2532-R-PLA, Plaintiff alleged that the shooting
14    of Lajuana Phillips was excessive and unreasonable. A deputy
15    had initially responded to a call regarding a woman who had
16    punched someone at a local business. The deputy made contact
17    with Ms. Phillips and deployed OC spray into the vehicle Ms.
18    Phillips was in when Ms. Phillips refused to exit the vehicle.
19    When Ms. Phillips started to slowly drive away, the deputy shot
20    into the side of the vehicle and killed Ms. Phillips. Neither the
21    deputy nor anyone else was in the pathway of the vehicle when
22    the deputy shot into the vehicle. Ms. Phillips did not pose an
23    immediate threat of death or serious bodily injury when the
24    deputy shot and killed her.

25    (g)    In *Young v. County of San Bernardino, et al.*, case number 5:15-
26    CV- 01102-JGB-SP, Plaintiff argued that the 2014 shooting of
27    Keivon Young was excessive and unreasonable. Deputies,
28    searching for a murder suspect, went to the wrong house. Mr.

-17-
SECOND AMENDED COMPLAINT FOR DAMAGES

Young was visiting residents of the house at the time the
deputies arrived and did not match the description of the murder
suspect. At some point, the deputies attempted to quietly
approach Mr. Young from behind. Upon hearing footsteps, Mr.
Young began to turn around and almost simultaneously heard
"let me see your hands." As Mr. Young was turning around, the
deputies shot Mr. Young and Mr. Young immediately dropped to
the floor. While Mr. Young had knives in his waistband, at no
point prior to or during the shooting did Mr. Young attempt to
reach for his waistband. After Mr. Young fell to the ground, the
deputies continued to shoot Mr. Young several times while he
was on the ground. In 2016 a jury agreed and awarded a high six-
figure verdict in Plaintiff's favor.

59.    By failing to provide adequate training to COUNTY sheriff's deputies,
including DOE DEPUTIES, COUNTY acted with an intentional, reckless, and
callous disregard for Plaintiff's constitutional rights. Defendants DOES 6-10, each
of their actions were willful, wanton, oppressive, malicious, fraudulent, and
extremely offensive and unconscionable to any person of normal sensibilities.

60.    By reason of the aforementioned acts and omissions, Plaintiff suffered
serious bodily injury, humiliation, pain and suffering, disfigurement, and past and
future emotional and mental distress, and financial loss.

61.    Accordingly, Defendants COUNTY and DOES 6-10 each are liable to
Plaintiff for compensatory damages under 42 U.S.C. § 1983.

62.    Plaintiff seeks compensatory damages for the violations of his rights,
including damages for past and future medical expenses, past and future loss of
earnings and decreased earning capacity, physical injuries, past and future pain and
suffering, emotional and mental distress stemming from the physical injuries,

humiliation, and disfigurement.  Plaintiff also seeks punitive damages, costs, and attorney's fees under this claim.

## FIFTH CLAIM FOR RELIEF

**Municipal Liability – Unconstitutional Custom or Policy (42 U.S.C. § 1983)**

(Against Defendants COUNTY and DOES 6-10)

63.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 62 of this Complaint with the same force and effect as if fully set forth herein.

64.     At all relevant times, Defendants DOE DEPUTIES were acting under color of state law.

65.     When Defendants DOE DEPUTIES detained and arrested Plaintiff, struck Plaintiff with lethal and less-lethal rounds, shot at Plaintiff, held Plaintiff prone against the ground while exerting force and weight on Plaintiff's back for a prolonged period of time, and denied him timely medical attention, they acted pursuant to an expressly adopted official policy/ies or a longstanding practice(s) or custom of the Defendant COUNTY respectively.

66.     On information and belief, COUNTY made a formal decision that the use of deadly and non-deadly force against Plaintiff was found to be "within policy" of the COUNTY's Sheriff's Department protocols, notwithstanding that Plaintiff was not an imminent threat to DOE DEPUTIES at the moment DOE DEPUTIES used deadly and non-deadly force against Plaintiff. This manifests a deliberate indifference to the civil rights of the residents of the COUNTY.

67.     Defendant COUNTY and DOES 6-10, ratified, acquiesced, and condoned the use of deadly and non-deadly force against Plaintiff by DOE DEPUTIES.

68.     On information and belief, Defendants DOE DEPUTIES were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection

with the detention, arrest and use of force against Plaintiff, which evidences ratification and acquiescence thereof and thereto.

69.    Defendants COUNTY and DOES 6-10, together with other COUNTY policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

(a)    Using excessive force, including excessive deadly force;

(b)    Providing inadequate training regarding the use of deadly force;

(c)    Employing and retaining as officers individuals whom Defendant COUNTY at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force;

(d)    Inadequately supervising, training, controlling, assigning, and disciplining COUNTY sheriff's deputies, and other personnel, whom Defendant COUNTY knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

(e)    Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling misconduct by COUNTY sheriff's deputies;

(f)    Failing to adequately discipline COUNTY sheriff's deputies for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

(g)    Announcing that unjustified shootings are "within policy," including shootings that were later determined in court to be unconstitutional;

      (h)   Even where shootings are determined in court to be unconstitutional, refusing to discipline, terminate, or retrain the officers involved;

      (i)   Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simply "code of silence," pursuant to which police officers do not report other officers' errors, misconduct, or crimes. Pursuant to this code of silence, if questioned about an incident of misconduct involving another officer, while following the code, the officer being questioned will claim ignorance of the other officers' wrongdoing;

      (j)   Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of police shootings, including by failing to discipline, retrain, investigate, terminate, and recommend officers for criminal prosecution who participate in shootings of unarmed people.

70.    It is the policy, custom, and practice of Defendant COUNTY to not objectively investigate complaints of previous incidents of wrongful shootings, excessive use of force, including deadly force, illegal arrests, falsification of police reports, and instead, to officially claim that such incidents are justified and proper.

71.    The policies, customs, and practices of Defendant COUNTY do in fact encourage COUNTY sheriff's deputies such as DOE DEPUTIES to believe that wrongful shootings, excessive use of deadly and non-deadly force against residents, illegal arrests, fabrication of police reports, is permissible and will be permitted by Defendant COUNTY. Defendants DOE DEPUTIES were aware of the policies, customs, and practices of Defendant COUNTY and used excessive force against Plantiff. These policies and customs of the COUNTY were the driving force that caused DOE DEPUTIES to use excessive force against Plaintiff.

SECOND AMENDED COMPLAINT FOR DAMAGES

72.    Other systemic deficiencies, policies, customs, and practices which indicated, and continue to indicate, a deliberate indifference to the violations of the civil rights by the COUNTY sheriff's deputies, such as DOE DEPUTIES, that Defendant COUNTY was aware of, and has condoned and ratified include:

(a)    Preparation of investigative reports designed to vindicate the use of excessive use of force, regardless of whether such force was justified;

(b)    Preparation of investigative reports which uncritically rely solely on the word of sheriff's deputies and police officers involved in the assault, battery, excessive use of force incidents and which systematically fail to credit testimony by non-police witnesses;

(c)    Preparation of investigative reports which omit factual information and physical evidence which contradicts the accounts of the officers involved;

(d)    Issuance of public statements exonerating officers involved in such incidents prior to the completion of investigations of the excessive use of force;

(e)    Failure to objectively and independently review investigative reports by responsible superior officers for accuracy or completeness and acceptance of conclusions which are unwarranted by the evidence of the wrongful shooting, assault, excessive use of deadly force, or which contradict such evidence.

73.    Defendants COUNTY and DOES 6-10, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above, these defendants condoned, tolerated and through actions and inactions thereby ratified such policies. Said defendants also acted with deliberate indifference to the foreseeable effects and consequences of

these policies with respect to the constitutional rights of Plaintiff and other
individuals similarly situated.

74.    By perpetrating, sanctioning, tolerating and ratifying the outrageous
conduct and other wrongful acts, COUNTY and DOES 6-10 acted with intentional,
reckless, and callous disregard for the life and constitutional rights of Plaintiff.
Furthermore, the policies, practices, and customs implemented, maintained, and still
tolerated by Defendants COUNTY and DOES 6-10 were affirmatively linked to and
were a significantly influential force behind the injuries of Plaintiff.

75.    The following are only a few examples of cases where San Bernardino
County Sheriff's Department Deputies were not disciplined, reprimanded, retained,
suspended, or otherwise penalized in connection with the underlying acts giving rise
to the below lawsuits, which indicates that the COUNTY routinely ratifies such
behavior, fails to train its Deputies, and maintains a practice of allowing such
behavior:

        (a)    In *V.R. v. County of San Bernardino, et al.*, case number 5:19-cv-
01023-JGB-SP, Plaintiffs argued that the use of less-lethal and
lethal munitions against decedent, Juan Ramos, was
unreasonable and excessive. Prior to the uses of force, officers
had responded to a call for reckless driving and had engaged in a
vehicle pursuit with Mr. Ramos. The pursuit ultimately ended in
a dead-end street where officers attempted to extract Mr. Ramos
out of his vehicle. The officers had information that Mr. Ramos
was in possession of an edged weapon. The officers broke the
vehicle's front passenger window. When Mr. Ramos
momentarily exited the vehicle, the officers deployed three
beanbag rounds at him and Mr. Ramos reentered his vehicle. A
few seconds later, Mr. Ramos exited his vehicle and ran away
from the vehicle and officers with the edged weapon in his hand.

SECOND AMENDED COMPLAINT FOR DAMAGES

1    As he was running in the direction of some civilians in a nearby

2    front yard, an officer shot at Mr. Ramos in the back. Prior to the

3    shooting, Mr. Ramos had not tried to attack anyone or stab

4    anyone with the edged weapon. In 2022, a jury returned a $4.5

5    million verdict against Defendant County of San Bernardino and

6    its involved deputies.

7    (b)    In *M.A., et al. v. County of San Bernardino*, Case No.: 8:20-cv-

8    00567-JFW-SHK, C.D. Cal., plaintiffs alleged that the 2019 fatal

9    shooting of Darrell Allen, Jr. was excessive and unreasonable

10    when deputies intentionally shot Mr. Allen several times without

11    warning. Deputies had responded to a domestic disturbance call

12    and was searching in the area of an apartment complex for Mr.

13    Allen. The deputies located Mr. Allen in the laundry room and

14    ordered Mr. Allen to exit the laundry room with his hands up. It

15    is believed that at some point, Mr. Allen was in possession of a

16    knife, but at the time of the shooting, Mr. Allen's hands were up,

17    open, and empty and Mr. Allen was facing away from the

18    deputies. At no time prior to the shooting did it appear that Mr.

19    Allen was going to attack or seriously injure the deputies. Mr.

20    Allen was not an immediate threat of death or serious bodily

21    injury. Two deputies were present at the time of the shooting, but

22    one deputy claimed that he did not shoot. Despite several

23    percipient witnesses indicating that they had seen both deputies

24    shoot and there being a discrepancy in the number of bullets

25    fired and the forensic evidence at the scene indicating that more

26    shots had been fired than the weapon round count indicated, an

27    investigator for COUNTY testified that he chose not to take the

28    second deputy's gun into custody and did not do a bullet analysis

1    on the second deputy's gun because the investigator did not want

2    to disbelieve the second deputy or accuse him of lying. The

3    Lethal Force Encounters ("LFE") Review Board makes

4    recommendations to the Sheriff regarding whether the LFE was

5    in policy, whether it was intentional or accidental, whether

6    training and/or policy issues have been addressed appropriately,

7    and whether to close the case pending the results of the District

8    Attorney's review. The LFE Review Board sends the Sheriff a

9    Findings and Recommendations Memorandum. The Sheriff

10   reviews and ultimately approves the findings and

11   recommendations. The shooting of Mr. Allen was found to be

12   not out of policy. In 2021, the case settled for a seven-figure

13   settlement. On information and belief, no deputy was retrained,

14   provided additional training, disciplined, suspended, or

15   terminated as a result of this incident.

16   (c)    In *Brown v. County of San Bernardino*, case number 5:20-cv-

17          01658, Plaintiff alleged that San Bernardino County Sheriff's

18          Deputies used excessive and unreasonable force when they shot

19          him several times and when he never threatened any person with

20          a weapon or vehicle. Plaintiff was in a moving slow-moving

21          vehicle and no one, including any of the deputies, were in the

22          direct path of the vehicle when deputies shot numerous times

23          into the side of the vehicle. In 2021, the parties settled the case

24          for a high six-figure settlement. Upon information and belief, no

25          deputy was retrained, provided additional training, disciplined,

26          suspended, or terminated as a result of this settlement.

27   (d)    In *Estate of Merlin Factor v. County of San Bernardino, et al.*,

28          case number 5:14-cv-01289-DMG-AGR(x), Plaintiffs argued

that the use of deadly force against the unarmed Merlin Factor was unreasonable. Mr. Factor was a passenger inside a car that had been pulled over. When a deputy opened the passenger door, Mr. Factor stepped out and started to run away. The deputy grabbed Mr. Factor's hand and Mr. Factor wrapped his arms around the deputy. Another deputy tased Mr. Factor and then yelled out "gun," even though Mr. Factor was unarmed. The deputy who had tased Mr. Factor then shot at Mr. Factor while Mr. Factor was halfway in the car. The police reports showed that Mr. Factor was unarmed, and the parties settled the case for a high six-figure settlement.

(e)    In *Ranero v. County of San Bernardino*, Case No. 5:16-cv-02655, C.D. Cal., the COUNTY settled with a man involved in a non-fatal police shooting that resulted in serious injuries including the loss of use of the victim's left leg. The deputies had responded to a domestic disturbance call wherein Luis Ranero was barricaded inside the home. After some time had passed, Mr. Ranero exited the house and was given commands to show his hands. Mr. Ranero complied with commands to show his hands and brought his hands up, with one hand holding a yellow-colored bottle of Muscle Milk. Deputies shot at Mr. Ranero despite Mr. Ranero being unarmed, was complying commands at the time of the shooting, and was not posing a threat prior to or at the time of the shooting. The COUNTY ratified the deputies' conduct, finding the shooting to be "within policy," and failed to reprimand, retrain, or otherwise penalize the deputies for their conduct.

(f)    In *Archibald v. County of San Bernardino*, case number 5-16-cv-1128, Plaintiff argued that the involved San Bernardino County Sheriff's deputy used deadly force against the unarmed Nathanael Pickett when he posed no immediate threat. The deputy initially made contact with Mr. Pickett because Mr. Pickett looked at him while crossing a marked crosswalk at night. The deputy followed Mr. Pickett onto the grounds of a motel and attempted to detain Mr. Pickett, despite there being no reasonable suspicion to detain. Mr. Pickett refused to stop and continued to walk away from the deputy. The deputy pursued Mr. Pickett and as Mr. Pickett was attempting to get away, Mr. Pickett tripped and fell. While Mr. Pickett was on the ground, the deputy threatened to tase Mr. Pickett. The deputy then went hands-on with Mr. Pickett with the intention of handcuffing him. When Mr. Pickett resisted, the deputy struck Mr. Pickett several times and a struggled ensued as Mr. Pickett tried to get away. While both were on the ground, with the deputy on top of Mr. Pickett, the deputy pulled out his gun and shot and killed Mr. Pickett. The jury in that case returned a $33.5 million verdict against Defendant County of San Bernardino and the deputy. The COUNTY ratified the deputy's conduct, found the detention and shooting to be "within policy," and failed to reprimand, retrain, or otherwise penalize the deputy for his conduct. The COUNTY negligently retained the deputy following this shooting, which resulted in a subsequent shooting by the same deputy of another unarmed man, for which the COUNTY settled with the victim prior to any litigation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(g)   In *T.M. (Phillips) v. County of San Bernardino, et al.*, case number 5:18-cv-2532-R-PLA, Plaintiff alleged that the shooting of Lajuana Phillips was excessive and unreasonable. A deputy had initially responded to a call regarding a woman who had punched someone at a local business. The deputy made contact with Ms. Phillips and deployed OC spray into the vehicle Ms. Phillips was in when Ms. Phillips refused to exit the vehicle. When Ms. Phillips started to slowly drive away, the deputy shot into the side of the vehicle and killed Ms. Phillips. Neither the deputy nor anyone else was in the pathway of the vehicle when the deputy shot into the vehicle. Ms. Phillips did not pose an immediate threat of death or serious bodily injury when the deputy shot and killed her.

(h)   In *Young v. County of San Bernardino, et al.*, case number 5:15-CV-01102-JGB-SP, Plaintiff argued that the 2014 shooting of Keivon Young was excessive and unreasonable. Deputies, searching for a murder suspect, went to the wrong house. Mr. Young was visiting residents of the house at the time the deputies arrived and did not match the description of the murder suspect. At some point, the deputies attempted to quietly approach Mr. Young from behind. Upon hearing footsteps, Mr. Young began to turn around and almost simultaneously heard "let me see your hands." As Mr. Young was turning around, the deputies shot Mr. Young and Mr. Young immediately dropped to the floor. While Mr. Young had knives in his waistband, at no point prior to or during the shooting did Mr. Young attempt to reach for his waistband. After Mr. Young fell to the ground, the deputies continued to shoot Mr. Young several times while he

1    was on the ground. In 2016 a jury agreed and awarded a high six-
2    figure verdict in Plaintiff's favor.

3    76.    Furthermore, the policies, practices, and customs implemented and
4    maintained and still tolerated by Defendant COUNTY and DOES 6-10 were
5    affirmatively linked to and were significantly influential force behind the injuries of
6    Plaintiff.

7    77.    By reason of the aforementioned acts and omissions, Plaintiff suffered
8    serious bodily injury, humiliation, pain and suffering, disfigurement, and past and
9    future emotional and mental distress, and financial loss.

10    78.    Accordingly, Defendants COUNTY DOES 6-10 each are liable to
11    Plaintiff for compensatory damages under 42 U.S.C. § 1983.

12    79.    Plaintiff seeks compensatory damages for the violations of his rights,
13    including damages for past and future medical expenses, past and future loss of
14    earnings and decreased earning capacity, physical injuries, past and future pain and
15    suffering, emotional and mental distress stemming from the physical injuries,
16    humiliation, and disfigurement.  Plaintiff also seeks punitive damages, costs, and
17    attorney's fees under this claim.

18
19    //
20
21    //
22
23    //
24
25    //
26
27    //
28

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff JAMES WRIGHT, requests entry of judgment in his favor and against Defendants the County of San Bernardino and DOES 1-10, inclusive, as follows:

    A.    For compensatory damages in an amount to be proven at trial, including damages for his serious physical injuries, for his pain and suffering, for past and future medical expenses, for past and future financial loss, and past and future mental and emotional distress;

    B.    For punitive damages against the individual defendants in an amount to be proven at trial;

    C.    For statutory damages;

    D.    For interest;

    E.    For reasonable costs of this suit and attorneys' fees; and

    F.    For such further other relief as the Court may deem just, proper, and appropriate.

DATED:  November 7, 2024    LAW OFFICES OF DALE K. GALIPO

By_____*/s/ Hang D. Le*_____
    Dale K. Galipo
    Hang D. Le
    Attorneys for Plaintiff

SECOND AMENDED COMPLAINT FOR DAMAGES

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED:  November 7, 2024          LAW OFFICES OF DALE K. GALIPO

By_____*/s/ Hang D. Le*_____
Dale K. Galipo
Hang D. Le
Attorneys for Plaintiff

SECOND AMENDED COMPLAINT FOR DAMAGES