# EXHIBIT A

Richard S. Bryce
Criminal Justice Consulting

Date:  9 January 2025

# Rule 26 Report
# James Wright v. County of San Bernardino
## Case No.: 5:24-cv-01123-JLS-JC

The following report is respectfully submitted in compliance with Section (a)(2)(B) of Rule 26.  If called upon to testify as a witness in the above-entitled matter, I would offer the following opinions based on the information that was available to me at the time the report was prepared:

**ORIGIN OF ACTIVITY:**

On 12 December 2025, I was retained by Attorney Hang D. Le, Esq. of the Law Firm of Dale K. Galipo to review the documents, videos and photographs provided and render my opinions as to the appropriateness of the force used in the arrest of James Wright on June 7, 2022.

**DATA AND INFORMATION RELIED UPON:**
1. Helicopter Surveillance Video.
2. Jones Audio Recording.
3. Vairin's FTY Audio Recording.
4. Cameron Stanley Audio Recording.
5. Deputy T. Esquivel's Crime Report, COSB000109.
6. Deputy A. Quezada's Crime Report, COSB000110.
7. Deputy S. Ramirez's Crime Report, COSB000111.
8. Deputy F. Demara's Crime Report, COSB000140-147.
9. Deputy J Ortega's Crime Report, COSB000148-152.
10. Deputy D. Jones' Crime Report, COSB000153-159.
11. Deputy C. Stanley's Crime Report, COSB000160-165.
12. Deputy G. Vairin's Crime Report, COSB000166-172.
13. Detailed History for Police Inc# #VC221580344, COSB000114-127.
14. Message From Terminal/Unit, COSB000128-139.
15. Deposition of Cameron Stanley.

16. Deposition of Dashaun Jones.
17. Deposition of Garrett Vairin.
18. Deposition of James Wright.
19. San Bernardino County Sheriff's Dept. Less Lethal Shotgun Policy.
20. POST Learning Domain 20.
21. Helicopter video/belt audio.
22. Photographs at the scene of the interior of James Wrights' vehicle and his injuries.

**Case Overview:**

On Tuesday, June 7, 2022, San Bernardino Sheriff's deputies were involved in a vehicle pursuit involving James Wright. The pursuit was terminated in the City of Fontana, California. While arresting Mr. Wright for numerous vehicle code violations, Deputy Deshaun Jones shot Mr. Wright, in the upper body, twice with a beanbag shotgun. Mr. Wright was seriously injured by the shots he received, one of which perforated his chest and lungs, and was transported to the hospital.

**Opinions and Observations:**

The deputies at the scene of the terminated pursuit, including Deputy Jones, engaged in inappropriate tactics prior to the deployment of the less-lethal beanbag rounds. The deputies had already performed several PIT maneuvers that had ultimately rendered Mr. Wright's vehicle immobile. The deputies were aware that Mr. Wright's vehicle was now disabled.[1][2][3]

The deputies did not have any information that Mr. Wright had been involved in a violent crime, was associated with any weapons, was armed, had threatened to harm anyone, or had physically injured anyone.[4][5][6] Mr. Wright did not display any form of violence, aggressive behavior, or display

---

[1] Vairin deposition, p. 20, lines 8-13.

[2] Jones deposition, p. 30, lines 5-10.

[3] Stanley deposition, p. 25, line 25 to p. 26 line 4.

[4] Stanley deposition, p. 14, line 2 to p. 15 line 23.

[5] Vairin deposition, p. 16, line 6 to p. 17, line 15.

[6] Jones deposition, p. 17, line 11 to p., line 4, p. 18, lines 10-12.

any weapons when officers confronted him.[7] [8] [9] Mr. Wright never made any verbal threats to anyone.[10] [11] When Deputy Stanley initially approached the vehicle after the pursuit had terminated, he was able to visually confirm that the object Mr. Wright had in his hand was not a firearm and announced to other deputies that Mr. Wright was not holding a gun.[12] Deputy Stanley never saw anything that looked like a weapon after that.[13] Deputy Vairin and Deputy Jones never saw a weapon or anything that looked like a weapon in Mr. Wright's vehicle.[14] [15] The deputies heard Mr. Wright screaming throughout the encounter, yelling for help, and Deputy Jones believed Mr. Wright was hysterical.[16] [17]

Additionally, immediately after the pursuit was terminated, both deputies Stanley and Jones approached the passenger side of the vehicle without cover. Deputy Stanley stood next to the passenger side of the vehicle long enough to identify the object that Mr. Wright was holding was not a gun or weapon and break open the front passenger side window.

The deputies had the opportunity to de-escalate the situation without the intervention of force. Mr. Wright was not a flight risk at that time as he was inside a disabled vehicle. It also appeared to the deputies that Mr. Wright was hysterical but not aggressive or threatening. The deputies had the opportunity to provide additional commands to Mr. Wright and create a dialogue with him so that they could safely extract him out of the vehicle. The deputies also had the opportunity to approach Mr. Wright and pull him out of the vehicle or use lesser force to gain compliance. Rather than de-escalate the situation, Deputy Jones unnecessarily escalated the situation by deploying the beanbag rounds.

---

[7] Jones deposition, p.27, lines 4-11.

[8] Stanley deposition, p.30, lines 17-24.

[9] Vairin deposition, p.26, lines 2-7.

[10] Vairin deposition, p. 30, lines 17-19.

[11] Vairin deposition, p. 26 lines 5-7.

[12] Stanley deposition, p. 21, line 22 to p. 23, line 15.

[13] Stanley deposition, p. 30 lines 20-24.

[14] Vairin deposition, p. 25, line 23 to p. 26 line 4.

[15] Jones deposition, p. 27, lines 4-8.

[16] Vairin deposition, p. 26, line 8 to p. 27, line 8.

[17] Jones deposition, p. 65, lines 23-25.

4

Although Mr. Wright's vehicle being disabled, the deputies claim to have heard the vehicles engine revving as if it was trying to move.[18] [19] Despite this, Deputy Stanley positioned himself next to the passenger door of his patrol vehicle and directly behind Mr. Wright's vehicle.[20] [21] Additionally, despite standing directly behind Mr. Wright's vehicle and hearing sounds that led him to believe Mr. Wright was trying to move his vehicle and believing that he could be in danger of being hit or run over by the vehicle, Deputy Stanley does not recall every considering repositioning to a different location,[22] and there was no communication from any of the other deputies advising Deputy Stanley to move to a different location for officer safety. In fact, despite Deputy Stanley testifying that he walked over to where Deputy Jones was positioned when he first heard Mr. Wright's vehicle revving,[23] video of the encounter shows that Deputy Stanley walked back to his previous position directly behind Mr. Wright's vehicle and placed himself there for some time after that.

The deputies failed to formulate a tactical plan to safely extract Mr. Wright from the vehicle, including safe and proper positioning. The deputies further showed poor communication skills, contrary to standard police officer training and practices. Officers are train that, to ensure officer safety and the safety of others, officers must effectively communicate with each other, including advising each other of any critical occurrences or safety issues.

The amount of force and the method of deployment used by Deputy Jones against Mr. Wright was in violation of standard police practices and training, and POST Learning Domain 20.

Deputy Jones had the opportunity to use lesser force options to gain Mr. Wright's compliance rather than shooting him with the less lethal shotgun. He stated in his deposition that at the time he confronted Mr. Wright, he had at his disposal a taser, chemical mace and a police baton.[24]

---

[18] Stanley deposition, p. 26, lines 5-10.

[19] Jones deposition, p. 30, lines 5-17.

[20] Stanley deposition, p. 26, lines 16-21.

[21] *Id.*, p. 37, line 21 to p. 38 line 19.

[22] *Id.*, p. 38, lines 10-19.

[23] *Id.*, p. 38 line 20 to p. 39 line 4.

[24] Jones deposition, p.12, lines 9-11, 15-17, 21-3.

Deputy Jones could have used a taser or chemical mace rather than the more aggressive less lethal shotgun. Both deputies Stanley and Jones can be seen from the helicopter video, approaching and looking in the passage window of Mr. Wright's vehicle, without cover, prior to Deputy Jones shooting him with the less lethal shotgun.[25]

Deputy Jones should not have deployed the beanbag shotgun under the circumstances of this case, let alone twice. As discussed above, the deputies did not have any specific information that Mr. Wright was violent or was associated with or in possession of a firearm or weapon. In fact, Deputy Stanley verified that the object Mr. Wright held was not a firearm. Further, Mr. Wright never displayed any aggressive, threatening, or assaultive behavior when the officers confronted him. Instead, the deputies only heard Mr. Wright screaming hysterically.

At the time of the first beanbag deployment, the deputies knew that Mr. Wright's vehicle was disabled and could not move. Prior the first beanbag deployment, the deputies had heard Mr. Wright's vehicle rev a few times but did not see the vehicle move.[26] [27]Additionally, Deputy Stanley testified that, despite being positioned directly behind Mr. Wright's vehicle at the time of the beanbag deployment, he does not recall ever thinking that he was in danger of being hit or run over by Mr. Wright's vehicle.[28] Additionally, if Deputy Jones did believe that Mr. Wright was attempting to flee at the time of the first beanbag deployment, deploying the beanbag round would be contrary to officer safety, as striking someone with a beanbag round while they are operating a vehicle can cause a person to lose control.

At the time of the second beanbag deployment, Mr. Wright still had not displayed any aggressive or assaultive behavior, still had not verbally threatened anyone, and still had not displayed a weapon. Even if Mr. Wright's hands were moving around at the time of the second beanbag deployment as Deputy Jones claims, this still would not have justified the second beanbag deployment as the deputies did not have any information that Mr. Wright was violent, was associated with or in possession with a weapon or firearm, and never saw Mr. Wright with a weapon or firearm.

---

[25] Surveillance video @19:51:08, 19:52:58.

[26] Stanley deposition, p. 19 line 19 to p. 20 line 1.

[27] Jones deposition, p. 31, lines 4-8.

[28] Stanley deposition, p. 39, lines 9-12.

6

Additionally, Deputy Vairin testified that he could not see Mr. Wright's hand before the beanbag round deployments.[29] Yet, Mr. Wright never displayed a weapon or showed any aggressive or aggressive behavior.

Further, Deputy Jones stated in his deposition, when he was asked where he was positioned when he fired his second beanbag round, he responded, "On the curb area.  Like, the general area of the curb, on the curb."[30]  Deputy Jones was again asked, "And when you fired the second beanbag round, were you - - were you at the - - at the curb?"  He responded, "I was in the - - I know I was on the curb."[31]

The helicopter video, synced with the belt audio recording clearly shows that Deputy Jones was not on or near the curb area when he fired the second beanbag round, he was leaning over the front of his patrol vehicle in essentially the same position as when he fired his first round from the less lethal shotgun.[32] Both shot fired by Deputy Jones were less than 15 feet from Mr. Wright.

Deputy Jones violated standard police practices and training and POST standards when he deployed the two less lethal shotgun beanbag rounds at less than 15 feet from Mr. Wright. When asked whether he was trained that the less lethal beanbag shotgun round should not be used within a short distance, because that could cause serious injury, even death," Deputy Jones replied, "Yeah. Generally we shouldn't be less than 20 feet."[33] [34] When asked whether he was generally trained that he should not be too close when deploying the beanbag projectile "because given the speed and the projectile itself, you could cause serious injury to someone if you're shooting at him too close," Deputy Jones answered. "Yes, I believe so."[35] He further when on to testify that his understanding on the training on that particular point was "to be at least 20 feet away."[36]  Deputy Stanley testified that he was trained that the optimal range to deploy the less-lethal shotgun with a beanbag round was 20 to 50 feet because any closer, the deployment could

---

[29] Vairin deposition, p. 25, lines 9-22.

[30] *Id.* p. 34, lines 11-14.

[31] *Id.* P. 35, lines 22-24.

[32] Helicopter video/belt audio, 19:52:49, 19:53:19.

[33] Jones deposition, p. 42, lines 6-10.

[34] *See* Less Lethal Shotgun Policy, 3.628.15.

[35] Jones deposition, p.42, lines 18-22.

[36] Jones deposition, p. 42, lines 23-25.

be "more dangerous," and cause more injury.[37] [38] He further testified that he was trained that deploying the beanbag round at less than 20 feet could cause serious injury.[39] Deputy Vairin testified that he was trained to deploy the beanbag round at 20 feet but that under certain circumstances, it could be closer.[40] Deputy Vairin testified that he was trained that there must be an immediate threat of death or serious bodily injury present in order to deploy the less-lethal beanbag shotgun around at less than 20 feet.[41] Deputy Vairin also testified that he was trained that the deployment of the beanbag round at less than 20 feet could cause serious injury. [42] Further, the deputies are trained to avoid the head, neck, chest, and groin area when deploying less-lethal munitions as a deployment to one those areas is considered lethal force.[43] [44] [45] Thus, deploying the shotgun beanbag round at less than 20 feet at the chest area amounts to deadly force pursuant to standard police practices and training and POST.

Deputy Jones violated POST standards when he deployed the two less lethal shotgun beanbag rounds at less than 15 feet from Mr. Wright. POST Learning Domain 20 states, "Deadly force applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury. The decision to use deadly force to defend against an imminent threat of death or serious bodily injury to the officer or to another person is guided by federal case law and California state law."[46] POST Learning Domain 20 further incorporates California Penal Code Section 835a in its "Use of Deadly Force" section and states, "A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary…to defend against an imminent threat of death or serious bodily injury to the officer or to another person. [47] POST Learning Domain 20 incorporates Section 835a's definition of "imminent" and states, " a threat of death or serious injury is

---

[37] Stanley deposition, p. 12, line 16 to p. 13, line 4.

[38] *See* Less Lethal Shotgun Policy, 3.628.15.

[39] Stanley deposition, p. 13, lines 11-16.

[40] Vairin deposition, p. 13, line 9 to p. 14, line 2.

[41] Vairin deposition, p. 14, lines 7-12.

[42] Vairin deposition, p. 14 line 25 to p.15 line 8.

[43] Stanley deposition, p. 13, lines 5-10.

[44] Vairin deposition, p. 14, lines 19-24.

[45] Less Lethal Shotgun Policy, 3.628.15.

[46] POST Learning Domain 20, 4-3.

[47] POST Learning Domain 20, 4-4.

8

'imminent' when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediate cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed."[48] POST Learning Domain 20 also notes that, "it is the intent of the California State Legislature that peace officers use deadly force only when necessary in defense of human life."[49]

**Qualifications:**

I am qualified and competent to render my opinions in the case before this Court due to my education, experience, training and professional activities in criminal justice.

I am currently self-employed as a criminal justice consultant and enter private engagements with criminal justice agencies to perform a wide range of services, including audits and inspections, review of policy and procedure, administrative investigations, audits of practices and processes, development and delivery of training courses, original research, surveys, draft policies and procedures, staff development, meeting and conference facilitation, and expert testimony in court and before governing bodies.

I have over 33 years of continuous and escalating experience in law enforcement. My initial experience was as a patrol deputy with the Ventura County Sheriff's Department assigned to the contract city of Camarillo.  I performed routine patrol, traffic investigation and criminal investigation.  I was later assigned to a special enforcement patrol unit in the unincorporated area of Ventura County.  I performed surveillance of known criminals, gang activity, and special events along with assisting routine patrol deputies with their responsibilities.

In October of 1968, I was promoted to Senior Deputy and assigned as a training officer at the Ventura County Sheriff's Academy.

From April 1972, until December 1976, I was assigned to the Criminal Investigation Division.  During that period of time I worked burglary investigation,

---

[48] POST Learning Domain 20, 4-7; California Penal Code Section 835a(e)(2).
[49] POST Learning Domain 20, 4-7; California Penal Code Section 835a(a)(2).

undercover fencing and property crime investigation, undercover vice investigation, undercover narcotics investigation and undercover criminal intelligence investigation.

In December of 1976, I was promoted to sergeant and assigned to the Custody Division. I began my custody experience as a shift sergeant assigned to the Branch Jail Honor Farm and was later assigned as the administrative sergeant of that facility. I was responsible for budget, scheduling of personnel and development of operational policy.

In May of 1978, I was transferred to the Court Services Division. I was the supervisor of all bailiff's and court security deputies servicing the Ventura County Superior Court.

In January of 1979, I was promoted to Lieutenant and assigned to the Custody Division as the Facility Manager of the Oxnard Branch Jail. I also had collateral management responsibilities for the Sheriff's Inmate Transportation Unit and the Court Holding Facilities.

In November of 1979, I was transferred to the Support Services Division as the Court Services Bureau Commander. I was responsible for the management of all court services and civil process service. I was also given the responsibility of justification, preparation, presentation and implementation of a merger of the Ventura County Marshall's Department into the Sheriff's Court Services Division.

In December of 1980, I was transferred to the Special Services Division as the Special Investigations Bureau Commander. I was responsible for the management and operation of the Sheriff's Narcotics, Vice, and Criminal Intelligence Units.

In October of 1982, I was promoted to Commander and assigned as the Commander of the Special Services Division. I was responsible for the overall operation and administration of the Special Services Division, which included; major criminal investigation, narcotics investigation, vice and intelligence investigation, criminalistics laboratory, Sheriff's Air Unit and other special investigation functions.

In February of 1983, I was assigned as the Commander of the Custody Division. My responsibilities in that assignment included the operation and administration of 5 custodial facilities, 339 employees and the supervision of over 1500 inmates.

In March of 1986, I was appointed Assistant Sheriff.  I was responsible for the administration and direction of 4 of the 8 major divisions within the Sheriff's Department.  My primary responsibilities included; providing administrative direction to the Custody Division and its 5 facilities, giving administrative oversight to the Project Development Division with the design, development and construction of a new 2000 bed jail, providing administrative control over the entire Department's operational budget, giving primary approval for most disciplinary actions within the Department, presenting budget requests and other Department related matter to the Board of Supervisors, and representing the Sheriff in public forums.

In June of 1993, I was appointed Undersheriff and served in that position until my retirement in August of 1999.  As Undersheriff, I was responsible for the administration of the entire Sheriff's Department under the direction of the Sheriff. At the time of my appointment the Sheriff's Department was reorganized into 4 major divisions each headed by a Chief Deputy.  Each Chief Deputy reported directly to me.  The 4 divisions of the Sheriff's Department were comprised of the Detention Services Division, East Valley Police Services Division, West County Police Services Division, and Support Services Division.  The police services divisions included police service for the 5 contract cities of Thousand Oaks, Camarillo, Moorpark, Ojai and Fillmore.  The Sheriff's Department employed 1355 individuals with an operational budget in excess of $140,000,000.00.

FORMAL EDUCATION:

1985        Master of Public Administration
            University of La Verne

1982        Bachelor of Science: Criminal Justice
            University of La Verne

PROFESSIONAL CERTIFICATES:

    P.O.S.T.  Management Certificate

    P.O.S.T.  Supervisory Certificate

    P.O.S.T.  Advanced Certificate

    P.O.S.T.  Intermediate Certificate

P.O.S.T.  Basic Certificate

California Community College Teaching Credential (life)

PROFESSIONAL MEMBERSHIPS Past and Present:

American Correctional Association

American Jail Association

California State Sheriff's Association

California Peace Officer's Association

California Narcotic Officer's Association

National Sheriff's Association

Southern California Jail Manager's Association

Ventura County Deputy Sheriff's Association

## PREVIOUS CASES:

Mesa, Arizona
     Spencer v. City of Mesa – Feb 25 P

Santa Clara County, California
     Leal v. Officer Siegal et al. – Sep 06 D
     Garcia et al. v. County of Santa Clara – Dec 06 D
     Richard Carrasco v. County of Santa Clara – Jan 07 D
     Marino v. County of Santa Clara – Mar 07 D

Fresno, California
     Eliseo Renteria v. Tulare County – Sep 03 P
     Cindy Staunton v. City of Clovis – Jun 01 P
     Brock v. County of Fresno – Jul 21 P
     Flores v. County of Fresno – Jan 22 P

City of Houston, Texas
> Claudia Navarro Pineda, et al. v. City of Houston – Dec 00 D

Riverside County, California
> Zaragoza v. Riverside County – Mar 22 P

City of Bakersfield, California
> Perry v. City of Bakersfield – Sep 20 P

Pasadena, Texas
> Moises Delao v. The City of Pasadena, Texas – Dec 96 D

Calaveras County, California
> Payne v. Calaveras County – Jan 20 P

Palm Springs, California
> Sandra Lee Denham v. City of Palm Springs – Nov 99 P

San Joaquin County, California
> Friends v. San Joaquin County – Mar 19 P

Harris County, Texas
> Alberti, v. Harris County – Apr 92 D
> Laura Sherrard v. Harris County – Nov 93 D
> Robert Earl McMullen III v. Harris County – Sep 94 D
> Jason Aguillard v. Joseph McGowen – Feb 96 D
> Alphonso Robinson v. Constable A. B. Chambers – May 98 D
> Brad Allen Mathes v. Harris County – Jun 99 D

Liberty County, Texas
> Womack v. Liberty County – Nov 93 D

Orleans Parish, Louisiana
> Hamilton v. Morial – Jun 93 D

Warren, Michigan
> Sondey v. Woloweic et al – Feb 16 P

Yuba County, California
> Court Appointed Monitor -- Present

Cass County, Michigan
    Nash v. Sheriff Underwood, Jr., et al. – Feb 16 P

Bexar County, Texas, Texas Attorney General
    DeVonish v. Lopez – Oct 93 D

Mendocino County, California
    Neuroth, et al. v. Mendocino County, et al. – Oct 17 D

San Bernardino County, California
    Mendoza v. San Bernardino County – Feb 21 P
    Person-Lynn v. San Bernardino County – Apr 22 P

Kern County, California
    McClure v. PTS – Dec 19 D

Monterey County, California
    Thomas Dewey v. Monterey County, et al. – June 15 D
    Claypole v. County of Monterey, et al. – Sep 15 D
    Villerreal v. County of Monterey – May 17 D
    Hernandez v. County of Monterey Court appointed monitor Present

Chino, California
    Brown v. City of Chino – July 21 P

San Mateo County, California
    Doe v. San Mateo County, et al. – Sep 17 P

Los Angeles County, California
    Dion Starr v. County of Los Angeles et al. --  09 D
    William Russell v. County of Los Angeles et al. – Jul 09 D
    Justin Henderson, et al. v. County of Los Angeles – Sep 10 D
    Ronald Johnson v. County of Los Angeles – Nov 10 D
    Kevin King v. County of Los Angeles – May 11 D
    Mariano Duvall v. Richard Torres et al. – Aug 12 D
    XYZ Distributors Inc. v. County of Los Angeles – Oct 12 D
    Christopher Brown v. County of Los Angeles – Jan 13 D
    Timothy Smith v. County of Los Angeles – May 13 D
    Mancilla v. County of Los Angeles – May 13 D

       Tyler Willis v. County of Los Angeles – Jun 13 D
       Frank Martinez v. County of Los Angeles – Jan 15 D
       Jaime A. Moreno v. County of Los Angeles – Aug 15 D

City of Santa Monica, California
       Gonzales v. City of Santa Monica – Sep 21P

City of Huntington Beach, California
       Shay v. City of Huntington Beach – 18 P

City of Hemet, California
       Arturro Jordan v. City of Hemet Dec 25 P

City of Long Beach, California
       Pream v. City of Long Beach – May 18 P
       Eugene Martindale v. City of Long Beach – June 2022 P
       Rudolph v. City of Long Beach – Jan 23 P

City of Los Angeles, California
       Kathleen Washington v. City of Los Angeles – Apr 12 D
       Hendley v. City of Los Angeles – Oct 16 P
       Murillo v. City of Los Angeles – Jul 22 P
       Gautier v. City of Los Angeles – Dec 22 P
       Peralta v. City of Los Angeles – Mar 25 P
       Petit v. City of Los Angeles – Aug 25 P

United States Department of Justice
       Doe v. Johnson – Jan 16 D
       Lion v. ICE – Feb 16 D

**FEE SCHEDULE:**

Initial Case Review $2000.00

This is a one-time fee for an initial review and assessment of the case and includes a preliminary written or oral report to client.

Consultation on Management and Operations ($250.00 per hour)

This hourly fee includes all labor associated with the study of jail or law enforcement management and operations, including preparation of reports and travel to and from site.

Case Review and Preparation ($250.00 per hour)

This hourly fee includes review of documents, interviews, site inspection, preparation of expert report and affidavit; and any other associated labor performed as directed.

Travel - $100.00 per/hr.

Formal Presentations ($2500.00per day or $1500.00 per half day)

This fee applies to Court appearances, depositions and hearings.

Expenses (actual)

Travel related expenses, including transportation, on site lodging and meals; will be billed at actual cost.  Other expenses associated with the provision of consultation or expert testimony may include postage, vehicle rental, parking, ground and air transportation, telephone and photography, all of which will be billed at actual cost.

Respectfully submitted,

*/s/ Richard Bryce*

Richard S. Bryce