# EXHIBIT B

ROUGH DRAFT      ROUGH DRAFT


ROUGH DRAFT      ROUGH DRAFT      ROUGH DRAFT

IMPORTANT INFORMATION!!

This realtime transcript is provided for your immediate

review of the proceedings and is not provided for nor

meant to be used or cited in any type of court

proceedings.


UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

Case No.: 5:24-cv-1123-JLS-AYP


JAMES WRIGHT,

                Plaintiff,

v.

COUNTY OF SAN BERNARDINO, GARRETT
VAIRIN, DESHAUN JONES, CAMERON
STANLEY, SERGIO RAMIREZ, FRANCISCO
DEMARA, AMINIDAB QUEZADA,
ALEJANDRO QUEZADA, and TRAVIS
ESQUIVEL,

                Defendants.
_____

VIDEOCONFERENCE DEPOSITION OF RICHARD SCOTT BRYCE

Monday, March 9, 2026

UNEDITED, UNCERTIFIED ROUGH DRAFT                          1

ROUGH DRAFT        ROUGH DRAFT

10:07 a.m.

Taken remotely via Zoom

REPORTED BY:
Mary P. Randle
CSR No. 10312

UNEDITED, UNCERTIFIED ROUGH DRAFT                2

ROUGH DRAFT        ROUGH DRAFT


1    APPEARANCES:

2    (Appearances via videoconference.)

3

4    For Plaintiff:

5            LAW OFFICE OF DALE K. GALIPO
             HANG D. LE, ESQ.
6            21800 Burbank Boulevard
             Suite 310
7            Woodland Hills, California 91367
             818-347-3333
8            hlee@galipolaw.com

9    For Defendant Deshaun Jones:

10           LYNBERG & WATKINS, APC
             SHANNON L. GUSTAFSON, ESQ.
11           1100 West Town & Country Road
             Suite 1450
12           Orange, California 92868
             714-937-1010
13           sgustafson@lynberg.com

14

15

16

17

18

19

20

21

22

23

24

25

3

ROUGH DRAFT     ROUGH DRAFT

1                    TAKEN REMOTELY VIA ZOOM

2                    MONDAY, MARCH 9, 2026

3                         10:07 A.M.

4

5          THE COURT REPORTER:  For the record, my name is

6    Mary Randle.  I am a State of California Certified

7    Shorthand Reporter.  My CSR license number is 10312.

8

9                    RICHARD SCOTT BRYCE,

10       having been first duly sworn, was examined and

11                    testified as follows:

12

13                        EXAMINATION

14    BY MS. GUSTAFSON:

15        Q    Can you please state your full name for the

16    record.

17        A    Richard Scott Bryce, B-R-Y-C-E.

18        Q    And, Mr. Bryce, how many times have you been

19    deposed?

20        A    Oh, shoot, I don't know.  I haven't kept track

21    of them, but 15, 20 times probably at least.  Maybe

22    more.

23        Q    Is it fair to say you're familiar with the

24    process and I don't need to go over the rules with you?

25        A    Yes.

                                                          4

                    ROUGH DRAFT    ROUGH DRAFT


1        Q    It's my understanding that you've been retained

2    to serve as an expert in this matter by the Plaintiff,

3    Mr. James Wright; is that correct?

4        A    Yes.

5        Q    And that you -- as -- you are offering opinions

6    related to the use of force on Mr. Wright?

7       A    That's correct, yes.

8       Q    Are there any other expert opinions that you

9   plan on offering in this case aside from opinions

10  related to the use of force on Mr. Wright?

11      A    Not unless I'm asked.

12      Q    At this time, have you been asked to offer any

13  other opinions outside of the use of force on

14  Mr. Wright?

15      A    No.

16      Q    Have you ever been retained by Mr. Galipo's

17  office in the past to serve as a police practices

18  expert?

19      A    Yes.

20      Q    On how many occasions?

21      A    Oh, three or four.

22      Q    And in those three or four occasions, were they

23  all use-of-force matters?

24      A    Yes.

25      Q    Did any of those other cases where you were

5

ROUGH DRAFT    ROUGH DRAFT

1   retained by Mr. Galipo involve the use of a beanbag

2   shotgun?

3      A    I believe one of them did, yes.

4      Q    Do you recall the name of that case?

5      A    Not off the top of my head.  I'd have to go

6   through the reports.  I don't know that they actually

7   shot the beanbag gun.  They -- but they had it -- it was

8   part of the equipment that the officers had with them.

9      Q    Understood.  So, it was an available force

10  option, but possibly not used in that other case?

11     A    Yes.

12     Q    In those three or four other cases where you

13  were retained by Mr. Galipo, were any of those deadly

14  force situations?

15     A    Yes.

16     Q    How many?

17     A    All of them.

18     Q    And was -- the deadly force involved the use of

19  a firearm?

20     A    Yes.

21     Q    And you've provided a Rule 26 report in this

22  matter, correct?

23     A    Yes, I have.

24          MS. GUSTAFSON:  And I'm going to go ahead and

25  put that up on the screen.

6

ROUGH DRAFT     ROUGH DRAFT

1          Hang, do you know what exhibit number we're on?

2          MS. LE:  I don't.  Sorry.

3          MS. GUSTAFSON:  Maybe I can just mark it next

4     in line and then let Mary know after the deposition.

5     BY MS. GUSTAFSON:

6     Q    I'm going to pull up your report and mark it as

7     an exhibit.  I just want to make sure I have the correct

8     document.

9          Do you have a document on your screen dated

10    January 9th, 2025?

11    A    Yes.

12    Q    And the one I have is 15 pages.  Is this your

13    report that you prepared in this case?

14    A    Just one second.

15         Yes, 15 pages, that's correct.

16    Q    And in your report you list 22 items that you

17    reviewed to come up with your opinions.  Are these all

18    the items that you reviewed?

19    A    I don't know if it lists the -- the video that

20    was linked to Deputy Vairin's sound or body recording,

21    but I've also viewed that.

22    Q    So, fair so say that in addition to the 22

23    items listed, you also reviewed and relied upon a synced

24    video of the helicopter footage with Deputy Vairin's

25    belt recording?

7

ROUGH DRAFT        ROUGH DRAFT

1        A    That's correct, yes.

2        Q    Any other items that you reviewed to prepare

3    your opinions that are not listed on Rule 26 report?

4        A    That are not -- let me check one other thing.

5            No.  I think that's all of them.

6        Q    I just want to make sure we have a complete

7    list of what you reviewed to come up with the opinions

8    that are listed in your report.

9        A    I think that, including the -- the linked

10    video, was correct.

11        Q    I want to go to page 11 of your report, where

12    you list the previous cases that you've served as an

13    expert on just to make sure I understand.

14            So, next to each previous case, you list the

15    case, you list the date, and then you list a "P" or a

16    "D".  What does that stand for?

17        A    "P" is for plaintiff.  "D" is for defense.

18        Q    And that's what I surmised, but just wanted to

19    make sure.

20      A    That's it.

21      Q    And it looks like some of those cases go pretty

22  far back.  Is this a list of all the cases that you've

23  served as an expert in?

24      A    To my best recollection, yes.

25      Q    Are these all cases that you've been retained

8

ROUGH DRAFT      ROUGH DRAFT

1   in or only cases where you've given testimony in a depo

2   or at trial?

3       A    The ones I've been retained in.

4       Q    And so previous cases from page 11 -- looks

5   like it goes through to 14 -- is the list of all of the

6   cases that you have been retained as an expert?

7       A    Yes.

8       Q    And then you've included the approximate date

9   and the party that retained you?

10      A    Yes.

11      Q    Not party.  The side.  I'm sorry.

12      A    Yes.

13      Q    To your knowledge, have you ever been

14  disqualified as an expert by any court?

15      A    No.

16      Q    Then I'm just going to move down on your

17   report.  You have a fee schedule, which I understand is

18   one of the requirements.  Is this your standard fee

19   schedule that you charge on all cases presently or was

20   anything changed for this case?

21      A    Well, the only thing that would change is

22   the -- for depositions.  With California law not

23   allowing a set amount for deposition, I now charge $500

24   an hour.

25      Q    And so for the deposition today, your charge is

9

ROUGH DRAFT    ROUGH DRAFT

1   $500 an hour?

2      A    Yes.

3      Q    And that is the only thing that's not listed on

4   your fee schedule related to what -- how you charge your

5   time?

6      A    Yes, that's correct.

7      Q    Then you also have a section that lists your

8   qualifications, and I believe it starts on page eight

9   and continues on through page 11.  Is that current and

10   up to date?

11      A    Yes.

12    Q    Is there anything else -- anything you need to

13    add to your qualifications that would not be on this

14    report?

15    A    I don't believe so.

16    Q    When did you retire from law enforcement?

17    A    I retired, yes, from the sheriff's department

18    in August 1st, 1999.

19    Q    And that was the Ventura Sheriff's Department?

20    A    Ventura County, yes.

21    Q    When you were serving at the Ventura County

22    Sheriff's Department, did they use the less-lethal

23    shotguns, the beanbag?

24    A    Yes.  Before I retired, yes.

25    Q    When did they start -- when did the Ventura

10

ROUGH DRAFT    ROUGH DRAFT

1    Sheriff's Department start using that particular weapon?

2    A    I don't recall the date.

3    Q    Did you ever have -- when you were working at

4    the -- or the Ventura Sheriff's Department, did you ever

5    have occasion to train on that weapon?

6    A    No.

7    Q    Did you ever use the less-lethal shotgun at any

8      time when you were a law enforcement officer?

9          A    No.

10         Q    Was it an available option when you were

11     serving in a patrol capacity?

12         A    Not when I was in patrol capacity.

13         Q    Do you have an estimate as to when Ventura --

14     or when it became an available option for the Ventura

15     Sheriff's Department?

16         A    I -- I would think it was somewhere in the

17     '90s.

18         Q    When the less-lethal beanbag shotgun became an

19     available option did you ever attend training in the use

20     of that weapon?

21         A    No.

22         Q    Have you ever trained anybody in the use of the

23     less-lethal shotgun?

24         A    No.

25         Q    Since your retirement, have you attended any

                                                          11

ROUGH DRAFT     ROUGH DRAFT


1      training on the use of the less-lethal shotgun?

2          A    Not formal training programs.  I've reviewed

3      training documents and information on that -- on the use

4    of those weapons.

5        Q    Have you attended any formal training on the

6    use of the less-lethal shotgun?

7        A    No.

8        Q    Have you ever fired a less-lethal shotgun?

9        A    Not that I recall.

10       Q    You indicated you reviewed training material.

11   Can you describe for me that context?

12       A    Well --

13       Q    And referring only to the less-lethal shotgun

14   at this point.

15       A    Right.  Well, policy and procedures from

16   various departments, other documents, the use of force

17   in Domain 20.  Those kind of documents.

18       Q    Have you ever prepared any training materials

19   or written any publications on the less-lethal shotgun

20   and its use?

21       A    No.

22       Q    I might be missing it -- I'm going back to your

23   report.  Is there a "Publication" section on your

24   report?

25       A    A publication?

ROUGH DRAFT     ROUGH DRAFT

1        Q      Where you list any publications you have.

2        A      I've -- I don't have any publications.

3        Q      Okay.  That was going to be my next question.

4     Only because it's one of the requirements for Rule 26,

5     so I just wanted to confirm that.

6              It's not on there because you do not have any;

7     is that correct?

8        A      Yes, that's correct.

9        Q      When you indicate that you were -- you've

10    reviewed policies and procedures in Learning Domain 20

11    related to the less-lethal shotgun, were you reviewing

12    these materials in the context of serving as an expert

13    witness?

14       A      Yes.

15       Q      Have you ever reviewed any materials related to

16    the less-lethal shotgun outside of that context?

17       A      I might have, but I don't recall them at this

18    time.

19       Q      In the cases that you've served as an expert,

20    did any of them involve the actual deployment of the

21    beanbag from the less-lethal shotgun?

22       A      Yes.

23       Q      And that's aside from this one?

24       A      Yes.

25        Q    How many times have you served as an expert

13

ROUGH DRAFT        ROUGH DRAFT

1    where the less-lethal shotgun was deployed?

2        A    I'd have to go through all my cases.  I really

3    don't have a recollection of those.

4        Q    Are you able to provide any type of estimate?

5        A    I would just guess three or four at the most.

6        Q    Do you recall when the last time was that you

7    served as an expert related to the deployment of the

8    beanbag?

9        A    Specifically as a expert on the beanbag?

10       Q    Yes.

11       A    Well, the last time would have been -- let's

12   see.  Just give me one second here.

13            Well, again, I've testified in several cases

14   about the use of a non-lethal or a beanbag shotgun.  I

15   can't give you the case names at this time.  I'd have to

16   review those.

17       Q    Okay.  Fair enough.  I've got the list, so I

18   can look them up.

19       A    Okay.

20       Q    Thank you -- thank you for checking, though.

21          Are police officers in California trained to

22    consider the totality of the circumstances when deciding

23    what type of force is reasonable in a particular

24    scenario?

25          A    Yes.

14

ROUGH DRAFT      ROUGH DRAFT

1          Q    Are peace officers in California also trained

2    that deadly force is force that creates a substantial

3    risk of death or serious bodily injury?

4          A    Yes.

5          Q    And that -- are peace officers in California

6    trained that deadly force can be used when, under the

7    totality of the circumstances, there's an immediate

8    threat of death or seriously bodily injury to the

9    officer or another person?

10          A    Yes, an imminent threat.

11          Q    I'm sorry.  You -- imminent?

12          A    Yes.

13          Q    Would the incident involving Mr. Wright be

14    considered a high-risk traffic stop?

15          A    Depending on what aspect you look at it.  The

16    pursuit itself is high risk.  After the -- after

17    Mr. Wright was stopped, I -- I wouldn't classify that

18    necessarily as high risk.

19         Q    At what point would you classify the

20    circumstances were no longer high risk?

21         A    Once the stop was completed and they observed

22    Mr. Wright in the vehicle.

23         Q    So, even though Mr. Wright was refusing to exit

24    the vehicle, that would not be considered high risk at

25    that point?

                                                              15

ROUGH DRAFT    ROUGH DRAFT


1          A    Not high risk, no.

2          Q    What would you characterize it as?

3          A    Well, a traffic stop where an individual wasn't

4    cooperating with their request.

5          Q    Are you aware of how many pursuits there were

6    before Mr. Wright was finally stopped?

7          A    Two or three, as I recall.  Probably three

8    total.

9          Q    And during those pursuits, did Mr. Wright ever

10    engage any behavior that was dangerous to himself and

11    the public?

12         A    Yes.  It appeared that way in the way he was

13    driving, yes.

14        Q    Which included driving at a high rate of speed?

15        A    Yes.

16        Q    And, at least according to the officers,

17    driving on the wrong side of the road at one point?

18        A    Yes.  I don't recall seeing that, but I think

19    that was reported.

20        Q    And are you aware that only the last pursuit --

21    there's only video footage of the very last pursuit?

22        A    That's the only video I observed, yes.

23        Q    But there were two prior pursuits, at least

24    according to the officers, before the one that we see on

25    the video?

                                                        16

                    ROUGH DRAFT    ROUGH DRAFT


1        A    Yes.

2        Q    At least as reported by the officers, during

3    those three pursuits Mr. Wright was refusing to yield

4    and engaging in behavior that was dangerous to the

5    public?

6        A    Yes.

7        Q    Are you aware how many PIT maneuvers were

8    utilized before Mr. Wright's vehicle finally became in

9    the position where it was no longer moving?

10        A    Looked like three or four to me.  I think they

11   might have reported three, but I think actually it

12   looked more like four.

13        Q    And at this point Mr. Wright was in a

14   residential area?

15        A    Yes.

16        Q    Are you aware whether there were any citizens

17   outside at this time?

18        A    I don't recall that.

19        Q    Do you know if the officers reported that there

20   were any individuals that had come outside of their

21   house?

22        A    I vaguely remember a comment about that.

23        Q    That when Mr. Wright's vehicle became

24   positioned in this residential area, he was refusing

25   commands to get outside of the -- out of the car?

                                                          17

                    ROUGH DRAFT     ROUGH DRAFT

1         A    After he stopped, yes.

2         Q    Did you see evidence that he was moving his

3    hands around inside the vehicle?

4         A    Yes.

5          Q    Even with all of this, it's your opinion that

6    once that vehicle was stopped, this was no longer high

7    risk?

8          A    Yes.

9               I might back up one second and say that any

10   time an officer stops a vehicle, until they have

11   analyzed the situation or the circumstances, there's --

12   there's a risk involved because they don't know what

13   they're going to encounter until they approach the

14   vehicle and encounter the individual.  But I wouldn't

15   classify that as a high risk.  That is just a -- a

16   risk -- everyday risk with each and every traffic stop.

17         Q    But you would agree this was a little different

18   than a normal traffic stop in the sense that Mr. Wright

19   fled on multiple occasions before the stop?

20         A    Yes.

21         Q    Once the -- Mr. Wright's vehicle -- strike

22   that.

23              You would agree that Mr. Wright didn't

24   voluntarily stop, but that his vehicle was stopped due

25   to a PIT maneuver?

                                                          18

ROUGH DRAFT     ROUGH DRAFT

1      A    Yes.

2      Q    Would you agree that it was appropriate for --

3   or strike that.

4           Once Mr. Wright's vehicle came to rest, did you

5   see that the officers had their guns drawn on him?

6      A    Yes.

7      Q    And would the officers be trained to do that

8   under these circumstances?

9      A    Yes.

10     Q    Would they also be trained that if Mr. Wright

11  is not exiting the vehicle that they should consider

12  less lethal options?

13     A    Well, I -- I think any time that they encounter

14  an individual, they should consider least --

15  least-lethal use of force if it's appropriate.

16     Q    Yeah.  That was -- that was my fault.  That was

17  a poor, very general question.  Let me try to rephrase.

18          So, we've got the officers who are there with

19  their firearms.  Now, at that point, that's the use of

20  force that's available.  Would a reasonably well-trained

21  officer in that circumstances want to have at least one

22  other officer armed with some kind of less lethal option

23  instead of just having all of them point their firearms?

24     A    In the circumstances of this case, yes.

25     Q    And would you agree that at a certain point

19

ROUGH DRAFT        ROUGH DRAFT

1    Deputy Vairin did request that one of the officers

2    obtain less lethal?

3        A    Yes.  I -- I think that occurred after the

4    first shot.

5        Q    You believe that Deputy Vairin requested that

6    an officer obtain a less-lethal option after the first

7    shot?

8        A    As I recall listening to the video, I believe

9    the first shot had already been fired.  And then I heard

10   him say requesting least -- least-lethal shotgun.

11       Q    Did you hear anybody request less lethal before

12   the deployment of the less lethal?

13       A    I might have.  I just don't recall it at this

14   time.

15       Q    But at some point, Deputy Jones does retrieve

16   the less-lethal shotgun?

17       A    Yes.

18       Q    Is the less-lethal shotgun generally trained

19   that it's an intermediate level of force?

20       A    Well, it borders on lethal force, so I guess

21   you could say intermediate or close to the -- at least

22    close to the top of less-lethal force.

23        Q    When you have an individual like Mr. Wright who

24    is refusing to get out of his vehicle, is the training

25    generally that to the extent feasible, one person should

                                                              20

                    ROUGH DRAFT        ROUGH DRAFT


1    be giving the commands?

2        A    Well, that would probably be the -- the normal,

3    plan.  Just depends on the circumstances.  That would be

4    the normal tactical plan, that one officer would be

5    giving the commands, but that doesn't negate the

6    reasonableness of other officers giving commands as

7    well.

8        Q    Would you agree here that, for the most part,

9    it was Deputy Vairin that was communicating directly

10    with Mr. Wright?

11        A    That's -- the audio that I heard, that was

12    correct.

13        Q    Do you know what type of munitions the

14    less-lethal shotgun that the sheriff's department has

15    uses?

16        A    Well, they referred to this as their beanbag.

17        Q    Are you familiar with what type of beanbag?

18     A    I think it was listed in the report.  I can't

19    give it to you off the top of my head.

20     Q    Does Drag Stabilized sound familiar?

21     A    Yes.

22     Q    Other than what you reviewed in the reports in

23    this case, do you have any familiarity with that

24    particular type of ammunition?

25     A    No.  Well, not other than what I reviewed in

                                                          21

                    ROUGH DRAFT    ROUGH DRAFT


1    preparation for this report.

2     Q    Is the -- the beanbag shotgun generally

3    referred to as a less-lethal option?

4     A    Generally, yes.

5     Q    Is that because it's generally considered to be

6    a lower force option than a firearm?

7     A    Yes, if used appropriately.

8     Q    When you were a peace officer, did you ever

9    have occasion to use deadly force?

10     A    I had occasions to use it, yes.

11     Q    Did you ever actually use deadly force?

12     A    No.

13     Q    When was the last time you underwent any type

14    of law enforcement training related to the use of a

15    firearm?

16        A    It was back while I was still on the sheriff's

17    department, so it would have been before August 1st,

18    1999.

19        Q    Do you have any understanding as to the

20    accuracy of the less-lethal shotgun that was used in

21    this case?

22        A    I don't know that I've ever seen anything that

23    actually listed the -- the accuracy other than the

24    policy and procedure to use it between 20 and 50 yards.

25             Any shotgun sprays out, unlike a rifle or a

                                                              22

                    ROUGH DRAFT      ROUGH DRAFT


1    pistol.

2        Q    It's your understanding that the less-lethal

3    beanbag that was used in this case should be deployed

4    between 20 and 50 yards?

5        A    Yes.

6        Q    And do you know why the recommendation is that

7    it not -- or, strike that.

8             The deployment that it should be between 20 and

9    50 yards, is that a guideline or is that a legal

10    requirement, if you know?

11         A    I don't know of any law that specifically

12    limits the range.  It's the guideline that's given for

13    the reasonable use of that.  Otherwise -- if it's used

14    below 20 yards -- or 20 feet, it's a -- considered a

15    potential lethal weapon.  If it's used over 50 feet, the

16    accuracy is substantially, and the potential for it to

17    be effective is substantially diminished.

18         Q    Originally, you indicated 20 yards to 50 yards.

19    And now we've -- did you want to change that to 20 feet

20    to 50 feet?

21         A    Yes.  I apologize for that.

22         Q    And is that guideline because over 50 feet it's

23    not going to have as much impact?

24         A    Yes.  Potentially, yes.

25         Q    Or another way of saying that is it's likely to

                                                                    23

                        ROUGH DRAFT     ROUGH DRAFT


1    be less effective?

2         A    Yes.

3         Q    And then are the officers trained that using it

4    less than 20 feet may increase the risk for injury?

5         A    Substantially, yes.

6    Q    Well, is the training that less than 20 feet

7    alone substantially increase the risk or is it just that

8    the risk is increased?

9    A    I don't think I understand the question.  I'm

10   sorry.

11   Q    Is the training that if you use the less-lethal

12   shotgun less than 20 feet, you're increasing the risk?

13   Or is the training that anything less than 20 feet

14   substantially increases the risk?

15   A    I would say substantially increases the risk

16   to -- for serious bodily injury or death.

17   Q    Is there anything in -- or you reviewed the

18   sheriff's department less-lethal policy in this case,

19   right?

20   A    Yes.

21   Q    Is there anything in the sheriff's department's

22   policy that states if you use the less-lethal shotgun at

23   less than 20 feet, that alone substantially increases

24   the likelihood of serious bodily injury or death?

25   A    I don't know if it's worded exactly like that.

24

ROUGH DRAFT     ROUGH DRAFT

1    I'd have to look at the -- the policy again.

2      Q      Is there anything in POST Learning Domain 20

3   that would -- that states if you use the less-lethal

4   shotgun at less than 20 feet it substantially increases

5   the risk of serious bodily injury or death?

6      A      I don't recall that exact wordage.

7      Q      Would you agree that the training is that the

8   risk increases the closer you get to the suspect?

9      A      Yes.

10     Q      And by that, meaning there's going to be a much

11  greater risk at two feet than at 19 feet and three

12  quarters inches?

13     A      Yes.

14     Q      Do you have any opinion as to where Deputy

15  Jones was when he used the less-lethal shotgun?

16     A      Yes.

17     Q      What is that opinion?

18     A      Standing towards the front of his vehicle.

19     Q      And do you have an estimate as to how far he

20  was from Mr. Wright at that -- the time of the

21  deployments?

22     A      It appears to me that he was probably 15 feet

23  or less.  Probably less.

24     Q      And what are you basing that estimate on?

25     A      The width of the vehicle that he was standing

25

ROUGH DRAFT        ROUGH DRAFT

1    against and the distance after from that vehicle and to

2    the vehicle where Mr. Wright was located.

3        Q    Did you ever go out to the site of the

4    incident?

5        A    No.

6        Q    Have you ever measured either of the involved

7    vehicles?

8        A    No.  I've measured many vehicles, but those

9    specific vehicles, I haven't.

10        Q    Would you agree that when an officer is in one

11    of these situations, they're estimating how far or how

12    close they are to a suspect?

13        A    They should be, yes.

14        Q    Because they don't have a tape measure,

15    obviously, when they're out there?

16        A    That's correct.  I mean, they might have one,

17    but whether they use it or not, I wouldn't know.

18        Q    Yeah.  We wouldn't want them using it in this

19    situation?

20        A    Probably not.

21        Q    The report that we marked as exhibit to this

22    deposition, is this the only report you've prepared in

23    connection with this case?

24        A    Yes.  I drafted reports, but in completing,

25    that's my final report.

26

ROUGH DRAFT      ROUGH DRAFT

1         Q    Have you been asked to prepare any additional

2    reports?

3         A    No.

4         Q    Have you reviewed the report of defense expert

5    Ken Hubbs?

6         A    No.

7         Q    Do you know who Ken Hubbs is?

8         A    No.

9         Q    Do you have any prior experience with him?

10        A    If I have, I don't recall.

11        Q    And are all the opinions that you intend to

12    offer in this case contained in your report?

13        A    Yes, unless I'm asked questions to -- about

14    other issues.

15        Q    I believe there was a reference in your report,

16    and I'm trying to find the page where you indicate

17    that -- and I've just found it as I'm speaking.  I'm on

18    page four of your report, where, the very last sentence,

19   you state, "He," referring to Deputy Jones, "stated in

20   his deposition that at the time he confronted Mr. Wright

21   he had at his disposal a taser, chemical mace, and a

22   police baton"?

23       A   Yes.

24       Q   Would a -- would the taser have been an

25   appropriate option at any point during this particular

27

ROUGH DRAFT     ROUGH DRAFT

1   incident with Mr. Wright?

2       A   It could have been, yes.

3       Q   When would you have anticipated that the

4   officer should use the taser?

5       A   Well, after they broke the window, then they

6   could have reached in with the taser and used it if

7   necessary.

8       Q   And that would have been leaving a position of

9   cover and approaching Mr. Wright to use the taser?

10      A   They'd already done that.  So, yes.

11      Q   When you say "they," do you mean all the

12   officers had left their position of cover or was it just

13   Deputy Stanley that broke the window?

14      A   No.  Officer Jones left -- left his position of

15    cover several times while he was attempting to confront

16    Mr. Wright.

17         And a officer was -- I'm trying to remember now

18    if it was Officer Stanley or Vairin that broke the

19    passenger -- or, I mean, the driver's window and

20    approached him.

21         And then they approached him after they'd

22    broken the window to remove him from the car and removed

23    their position of cover.

24    Q    Prior to the deployment of the second beanbag

25    round, did anybody other than Deputy Stanley leave their

28

ROUGH DRAFT     ROUGH DRAFT

1    position of cover?

2    A    Yes.

3    Q    Who?

4    A    Pardon?

5    Q    Who?

6    A    Deputy Jones.

7    Q    And where did Deputy Jones go when he left his

8    position of cover?

9    A    He walked over in front of the window of the

10    car.

11      Q    In front of the window of --

12      A    The passenger --

13      Q    -- Mr. Wright's car?

14      A    Yes.

15      Q    How close to the car did he get?

16      A    I didn't -- I don't recall making an absolute

17   estimate of that, but I would say probably less than ten

18   feet.

19      Q    When he deployed the less-lethal shotgun, was

20   he on the opposite side of his patrol car from

21   Mr. Wright's car?

22      A    Yes.

23      Q    Prior to the deployment of the beanbag, did

24   Deputy Jones ever approach Mr. Wright's vehicle for --

25   and use any type of force?

29

ROUGH DRAFT      ROUGH DRAFT

1      A    I didn't see him use any other force other than

2   the -- the beanbag shotgun.

3      Q    Did you ever carry a taser when you were in law

4   enforcement?

5      A    No.

6      Q    What is your understanding of the effective

 7    rate of the taser for deployment?

 8        A    Well, it depends on the accuracy of the -- of

 9    the officer deploying it.  And oftentimes, a taser --

10    they miss the target with the taser and it doesn't make

11    contact with the individual's body -- both -- both

12    probes.  Oftentimes, it's very effective.  It just

13    depends.

14        Q    Is the taser as effect -- is the taser as

15    effective if only one dart actually hits?

16        A    No.

17             Well, it can be, on -- on a -- a drive mode

18    where they touch the person with the taser.  Stun drive.

19        Q    And using the shun drive mode, that requires

20    you to be contact-to-contact with the suspect?

21        A    With the taser, yes.

22        Q    So you have to be in very close range of the

23    suspect?

24        A    Within an arm's length, yes.

25        Q    And to use it in the dart mode, you need to

30

                    ROUGH DRAFT      ROUGH DRAFT

 1    have both darts attach for it to be effective?

 2        A    Yes.

3        Q    And would that be more difficult when you're

4    shooting the taser into a vehicle?

5        A    Well, to -- again, it would depend on how far

6    you were from the vehicle, and the opening, how big the

7    opening was.  There's a lot of variables there.

8        Q    But would it make it more difficult to

9    accurately deploy the taser so that both darts attached

10   when you're shooting into a vehicle versus somebody

11   outside of a vehicle?

12       A    Not necessarily.  It depends.  Again, if you

13   put the taser through the window and shot them, you'd

14   be -- that wouldn't limit your capability of making

15   contact.

16       Q    What if you're standing back away from the

17   window?

18       A    Well, the further back you get, the less

19   accurate it would be, yes.

20       Q    And is it fair to say that when the taser's

21   activated you cannot actually touch the suspect?

22       A    What do you mean?  I -- when it's being

23   activated?

24       Q    Yes.

25       A    Well, while you're activating it, you wouldn't

31

1    want to touch the suspect, no.  But that's pretty

2    momentarily.

3        Q    So, if you were to use the taser on Mr. Wright,

4    who was seated in his vehicle, you would have to use it

5    from a point that you were close enough that both darts

6    attach to be effective.  And then after the deployment,

7    you would have to still get him out of the car while the

8    taser was still -- he was still feeling the effects from

9    the taser.  Is that fair to say?

10       A    Well, again, that wouldn't -- the -- it

11   wouldn't endanger the officer.  Once the -- the taser's

12   been deployed, it wouldn't consistently being --

13   charging the -- the individual.  I -- if I'm

14   understanding your question correctly.  It wouldn't be

15   any more than if he was laying on the pavement after you

16   used it.  You could go over and handcuff him.  And so

17   that wouldn't prevent you from removing him from the

18   car.

19       Q    In this situation, once -- assuming the taser

20   was used on Mr. Wright, what -- assuming the taser was

21   effective, they would still have to get him out of the

22   car to handcuff him?

23       A    Yes.

24      Q     And were you aware whether the doors were

25      locked or unlocked at this time?

ROUGH DRAFT        ROUGH DRAFT

1       A     No, I don't -- I saw them reach in.  I don't

2       know if they were unlocking or just -- just opening the

3       latch from inside.  I don't know.

4       Q     Did you ever see the officers try -- before

5       they removed Mr. Wright, try to open the driver door

6       before breaking the window?

7       A     I might have.  I'd have to look at the video

8       again.  I would assume, however, having owned a BMW, and

9       that if he was driving it, which he was, if he didn't

10      unlock the vehicle after he was stopped, it would

11      have -- the door would have been locked.

12      Q     So, assuming the doors are locked and the taser

13      was used, would the officer still have had to break the

14      window to get in to Mr. Wright to get him out of the

15      vehicle and handcuff him?

16      A     I'm sorry, could you repeat that?  I apologize.

17      Q     Assuming all the doors of the BMW were locked

18      and the taser was used effectively, meaning the darts

19      both hit and they were both used effectively, in order

20    to get Mr. Wright out of the car at that point would

21    they have then still had to break the driver's side

22    window?

23         A    Yes.  Yes.

24         Q    You referenced chemical mace.  Do you know what

25    type of less -- or strike that.

33

ROUGH DRAFT       ROUGH DRAFT

1              Do you know what type of chemical option

2    Mr. Jones had on his person?

3         A    He said he had chemical mace.

4         Q    Do you know what he meant by that?

5         A    Yes.  Chemical mace.

6         Q    Do you know what OC spray is?

7         A    Yes.  That's probably what he had.  I -- he

8    didn't identify the specifics of it.

9         Q    Do you know whether the type of spray that the

10    sheriff's deputy had was the type that there's a stream

11    or whether it fans out?

12         A    I don't know what he had.

13         Q    Assuming it was the type of spray that fans

14    out, do you know how close he would have to be to the

15    vehicle for it to be effective?

16    A    Well, they would have had to break the window

17    first.  And so after they broke the window, I don't

18    know -- I don't know what you mean by how close they'd

19    have to be.

20    Q    Do you -- well, if the -- it's the spray that

21    fans out.  Do you have to be right up against the window

22    or can you be a little farther back for it to have any

23    impact on Mr. Wright in the vehicle?

24    A    Well, after you'd gone through the process of

25    break -- standing in front of a window and breaking it

34

ROUGH DRAFT      ROUGH DRAFT

1    out, I would assume that you would go ahead and point

2    the spray directly in the window at him.

3    Q    You understand that it was Deputy Stanley that

4    broke the window, right?

5    A    Yes.

6    Q    Do you believe that pepper spray could have

7    been effectively used in this case?

8    A    Yes.

9    Q    At what point?

10    A    After they'd broken the window, they could have

11    used it to subdue Mr. Wright and remove him from the

12    vehicle.

13         Q    Did you ever carry OC spray when you were an

14    officer?

15         A    No.

16         Q    Have you ever been trained on the use of OC

17    spray?

18         A    Yes.

19         Q    When was that?

20         A    Pardon?

21         Q    When was that?

22         A    That would have been when I was a commander in

23    custody, so I'd have to -- let me real quick look at

24    this date here.

25              Probably been in the early '80s.

35

ROUGH DRAFT     ROUGH DRAFT

1          Q    I'm sorry, what?

2          A    '80s, 1980s.

3          Q    And was the type of spray you had, was that

4    the -- a stream or was it a fan out?

5          A    The type we used then was a stream.

6          Q    Have you ever used the type of OC spray that

7    actually fans out instead of stream?

8      A    No.

9      Q    You also reference the use of a baton or

10   that -- or I'm sorry.  Strike that.

11          You reference that Deputy Jones had a baton?

12     A    Yes.

13     Q    Do you believe he should have used a baton at

14   some point in this incident?

15     A    Well, it's a -- a good instrument to use to

16   break the window.

17     Q    And that was done by Deputy Stanley, correct?

18     A    Yes.

19     Q    Would you use it for any other reason?

20     A    Well, in this incident, it probably wouldn't

21   have been effective.

22     Q    When the officers are -- or when the deputies

23   are dealing with Mr. Wright, fair to say they hadn't had

24   the opportunity to search his vehicle at that point?

25     A    No.  They'd looked in it, but they hadn't

                                                          36

                  ROUGH DRAFT     ROUGH DRAFT


1    searched it.

2      Q    Are officers trained that -- to consider as a

3    factor that hands kill?

4      A    That hands kill?

5      Q    Yes.

6      A    Yes.

7      Q    And because of that, you always have to be

8    aware of where a suspect's hands are?

9      A    Yes.

10     Q    And during this incident, was Mr. Wright making

11   it difficult for the officers to see where his hands

12   were?

13     A    I don't know that he was making it difficult.

14   There was some obstructions -- the vehicle itself and

15   the window before they broke it out.

16     Q    Well, you say the window before they broke it

17   out.  Was that because the windows were tinted?

18     A    That's what they said, yes.

19     Q    Could you see also in the video that the

20   windows were tinted?

21     A    They appeared dark, so I assume they were.

22     Q    Did you see anything in the materials you

23   reviewed to indicate that after the first deployment

24   Mr. Wright rolled up -- or I'm sorry -- rolled up the

25   driver's side window so -- making it more difficult for

37

1    the officers to see him?

2        A    I didn't -- I couldn't see that, no.

3        Q    Did you hear one of the officers state that?

4        A    I remember -- I remember in one of the

5    depositions one of them being asked if -- if he'd rolled

6    down the window or -- I don't recall exactly that

7    aspect.

8        Q    Do you recall seeing in the video at one point

9    that the driver's side window was rolled down, but then

10    when they took out Mr. Wright out of the vehicle they

11    had to actually break the window on the driver's side

12    because it was rolled up?

13        A    I remember it being rolled up when they broke

14    the window.

15        Q    And if it was down previously, that would have

16    been Mr. Wright that rolled the window back up?

17        A    I would assume so, no.

18        Q    And with the windows being tinted, would that

19    make it more difficult for the officers on the driver's

20    side to see what Mr. Wright was doing with his hands?

21        A    I would assume so, yes.

22        Q    When Deputy Jones deployed the first beanbag

23    round, was Deputy Stanley behind Mr. Wright's vehicle?

24        A    As I recall, yes.

25        Q    Given those circumstances, do you believe it

                                                                    38

                        ROUGH DRAFT        ROUGH DRAFT


 1    was -- a reasonably well-trained officer would have

 2    believed that Deputy Stanley could be in danger at that

 3    point?

 4        A    He said he wasn't.

 5        Q    I'm asking you what officers observing Deputy

 6    Stanley, such as Deputy Jones or Deputy Vairin, would

 7    believe.

 8        A    I don't know what they'd believe.

 9        Q    Do you think it would be reasonable for an

10    officer -- obviously, the officers on the scene do not

11    know what's in Deputy Stanley's mind.  Is that fair to

12    say?

13        A    Yes.

14        Q    But they would have observed that he was behind

15    the vehicle, correct?

16        A    I don't know.  They might have.

17        Q    If they were looking at Deputy Stanley, they

18    would have seen that he was behind the vehicle?

19        A    If he's standing behind the vehicle and they

20    are looking at him, yes.

21    Q    And you understood from reviewing Deputy Jones'

22    testimony that he heard Mr. Wright revving the engine?

23    A    Yes.

24    Q    And he believed that Mr. Wright was trying to

25    break his car free?

39

ROUGH DRAFT        ROUGH DRAFT

1    A    Yeah, he might have been believing that.

2    Q    And if a reasonable officer believed that

3    Deputy Stanley was behind the vehicle and Mr. Wright was

4    trying to back up the vehicle -- assuming those facts,

5    would it be reasonable to deploy the beanbag round at

6    that time from Deputy Jones' position?

7         MS. LE:  Objection; incomplete hypothetical.

8         THE WITNESS:  Well, there's a lot of factors to

9    consider.  One would be firing a beanbag at an

10    individual that was operating a vehicle creates a

11    substantial danger in itself and might have further

12    endangered one of the officers.

13    BY MS. GUSTAFSON:

14    Q    Would also a factor to be considered that you

15    want to stop Mr. Wright before he's able to move the

16    vehicle towards Deputy Stanley?

17    A    Well, they'd already disabled the vehicle.

18    Q    Can we -- can any of those officers say with

19    any certainty that Mr. Wright was -- vehicle was

20    incapable of moving at that point in time?

21    A    It appears that it was.  They -- again, they

22    heard the engine rev, but the car didn't move.

23    Q    If that was because the vehicle was up against

24    Vairin's patrol car, but then somehow was able to

25    position in a way that it could move, that's a

                                                        40

ROUGH DRAFT        ROUGH DRAFT


1    possibility that could happen, correct?

2    A    That isn't what happened.

3    Q    I'm asking if it's a possibility they have to

4    consider.

5    A    I -- I don't know.  That would be up to them,

6    whether they -- what they wanted to consider.

7    Q    Without being inside the vehicle to know how

8    the vehicle's moving, they can't know for certain that

9    the vehicle is, in fact, disabled, meaning it's

10    completely incapable of moving?

11    A    I -- I guess you could say that.

12    Q    Do you know what police officers are trained

13    regarding what the target areas are for the beanbag?

14        A    The target areas they are to avoid are the

15    chest, the head, and the groin.

16        Q    Do you know where Deputy Jones was aiming when

17    he deployed the beanbag the first and second time?

18            MS. LE:  Objection; calls for speculation,

19    lacks foundation.

20            THE WITNESS:  I could speculate on my

21    observance of what happened to him and the access he had

22    to the inside of the car.

23    BY MS. GUSTAFSON:

24        Q    Let me -- let me ask a different question

25    because that's fair.  I don't want you to speculate.

41

ROUGH DRAFT      ROUGH DRAFT

1            Was there anything in the evidence that you

2    reviewed that -- where Deputy Jones stated where he was

3    aiming when he deployed the two beanbag rounds?

4        A    I didn't hear him state that, no.

5        Q    And Mr. Wright was not hit in the head,

6    correct?

7        A    I saw his head was bleeding.  I don't know what

8    caused that.

9      Q    Are you aware of anything in the evidence that

10   you reviewed to indicate either deployment of the

11   beanbag struck Mr. Wright in the head?

12     A    Well, again, his head was bleeding when he came

13   out of the car.  And he'd been shot twice with the

14   beanbag.  So, you know, I don't know what struck -- what

15   object struck him in the head, but he is obviously

16   been -- his --

17          (Audio glitch.)

18          THE COURT REPORTER:  You broke up.  Can you

19   repeat the last part of your answer.

20          THE WITNESS:  I don't know what object actually

21   struck him in the head, but his head was injured and

22   he'd been shot at twice with the beanbag before he

23   exited the vehicle.  So I don't know if it was one of

24   the projectiles from the shotgun that hit him or what it

25   was.

                                                    42

                   ROUGH DRAFT    ROUGH DRAFT


1    BY MS. GUSTAFSON:

2      Q    Do you have -- strike that.

3          What is your understanding of where the first

4    deployment of the beanbag struck Mr. Wright?

5      A    I -- seemed like they said in the pectoral

6    area, but it appears -- I don't know if it was the

7    shoulder or where it actually struck him.

8      Q    Do you intend to offer any opinions regarding

9    where the first beanbag round struck Mr. Wright?

10      A    The actual location of the injury, no.

11      Q    Same question for the second round.

12      A    No.

13      Q    Were you ever provided with Mr. Wright's

14    medical records at Arrowhead?

15      A    I don't -- I don't recall them.  I saw

16    photographs of his injuries, but I -- I don't think --

17    let me look.

18      Q    I'll represent to you that it's not on your

19    list of materials reviewed.  And so I just wanted to

20    confirm --

21      A    Okay.

22      Q    -- that you had not reviewed them?

23      A    Yes, then I didn't.

24      Q    Is it your understanding that Mr. Wright was

25    taken into custody after this incident?

43

ROUGH DRAFT     ROUGH DRAFT

```
 1      A    Yes.

 2      Q    And that he was -- after the hospital, he was

 3  taken to the West Valley Detention Center?

 4      A    I think I might have read -- well, no, I don't

 5  know.

 6      Q    Well, if Mr. Wright was in custody of the

 7  Sheriff's Deputy at the time he received the medical

 8  care at the hospital, is it typical that the Sheriff's

 9  Department pays for that medical care?

10           MS. LE:  Objection; calls for speculation.

11           THE WITNESS:  I don't know how they pay for

12  that in San Bernardino.

13  BY MS. GUSTAFSON:

14      Q    How did it work in Ventura?

15      A    Well, if -- if the injury occurred while in

16  custody, then the County would have covered.

17           MS. GUSTAFSON:  We've been going for about an

18  hour, and I think I'm coming close to wrapping up.

19  Maybe the we can take ten or 15 minutes just to review

20  and regroup?

21           MS. LE:  Okay.

22           THE WITNESS:  Okay.

23           THE COURT REPORTER:  Off the record.

24           (Recess taken from 11:16 a.m. until 11:30 a.m.)

25
```

44

ROUGH DRAFT        ROUGH DRAFT

1          MS. GUSTAFSON:  Off the record, we had a

2     discussion and agreed that we would mark next in line

3     would be 50 for Mr. Bryce's Rule 26 report.  So we'll

4     mark that as Exhibit 50 to the depo.

5          (Exhibit 50 marked.)

6     BY MS. GUSTAFSON:

7     Q    Mr. Bryce, at the time that Deputy Jones

8     deployed the first beanbag round -- I want you to assume

9     that he's in that position.  From that position, would

10    the taser have been an effective option?

11    A    Probably not from that position.

12    Q    And then same question as to the pepper spray?

13    A    The same.  Probably not.

14    Q    To use either of those options, he would have

15    had to move closer at the time that he deployed the

16    beanbag from the position he was in?

17    A    To be more effective, yes.

18    Q    Would you agree that penetrating wounds -- and

19    by "penetrating," I mean where the skin breaks -- are

20    rare with the beanbag?

21    A    When used at the appropriate distance, yes.

22          Q    Do you know how -- strike that.

23               It's also rare to have a penetrating wound when

24      the beanbag is used between 15 and 20 feet?

25          A    I don't know that that's the case, no.

                                                                45

                    ROUGH DRAFT       ROUGH DRAFT


1           Q    Have you ever seen any other case where there

2       was a penetrating wound when the beanbag was used at

3       15 feet?

4           A    No.

5           Q    Have you ever been involved in a case where

6       there was a penetrating wound when the beanbag was used?

7           A    Not to my recollection.

8           Q    Have you reviewed any studies as to how

9       frequently that type of injury occurs with the beanbag?

10          A    Not specifically.  Again, it would depend on

11      the distance from the -- between the person being shot

12      and -- and the discharge of the weapon.

13          Q    The chance of injury increases the closer you

14      get?

15          A    Absolutely.

16          Q    Do you know how common it is for the use of the

17      beanbag to cause death if it's used at a distance of

18    15 feet or greater?

19        A    I haven't seen any statistics on that.

20        Q    Would you agree that it's -- the beanbag's more

21    likely to cause a serious injury if the suspect is hit

22    in the head or the neck as opposed to another part of

23    the body?

24        A    Yes.

25        Q    At the time that Deputy Jones deployed the

                                                          46

                    ROUGH DRAFT      ROUGH DRAFT


1    first beanbag, other than potentially moving closer to

2    use the taser or moving closer to use the pepper spray,

3    are there any other alternatives that you believe would

4    have been reasonable at that point?

5        A    Yes.  To continue to try to de-escalate it and

6    get him to get out of the car.

7        Q    Up to that point, had there been -- and by

8    "de-escalate," you mean to continue to talk to

9    Mr. Wright?

10        A    Yes.

11        Q    Up to that point, had Mr. Wright shown any

12    signs that he was going to get out of the vehicle?

13        A    Not that I was aware of, no.

14              MS. GUSTAFSON:  I do not have any more

15      questions.

16              MS. LE:  I have no questions.  Thanks.

17              THE COURT REPORTER:  Do you want a copy,

18      Ms. Le?

19              MS. LE:  No, thank you, not at this time.

20

21              (Deposition concluded at 11:36 a.m.)

22

23

24

25

                                                          47