# Exhibit 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

JAMES WRIGHT,

       Plaintiff,

v.              Case No. 5:24-cv-01123-JLS-JC

COUNTY OF SAN BERNARDINO,
GARRETT VAIRIN, DESHAUN
JONES, CAMERON STANLEY,
SERGIO RAMIREZ, FRANCISCO
Demara, AMINIDAB QUEZADA,
ALEJANDRO QUEZADA, and
TRAVIS ESQUIVEL,

       Defendants.
_____/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE DEPOSITION OF

KENNETH HUBBS

TUESDAY, MARCH 3, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No.  24636

James Wright v. County of San Bernardino, et al.
Focus Litigation Solutions

Page: 1

APPEARANCES (Remote)

FOR THE PLAINTIFFS:

       LAW OFFICES OF DALE K. GALIPO
       BY:  HANG LE, ESQ.
       21800 Burbank Boulevard, Suite 310
       Woodland Hills, California 91367
       818.347.3333
       hlee@galipolaw.com

FOR THE DEFENDANTS:

       LYNBERG & WATKINS
       BY: EDWARD J. SOUTHCOTT, Esq.
       1100 W. Town & Country Road, Suite 1450
       Orange, California 92868
       714.937.1003
       esouthcott@lynberg.com

--oOo--

INDEX OF EXAMINATION

WITNESS:   KENNETH HUBBS

EXAMINATION BY                                    PAGE

      MS. LE................................4


EXHIBITS FOR REFERENCE

EXHIBIT                  DESCRIPTION                 PAGE

(NONE MARKED.)

--oOo--

that, from appearances, must be instantly confronted and addressed?

A.   Yes.

Q.   I'm going to now go into some training regarding the bean bag shotgun.  In this case, is it your understanding that Deputy Jones utilized a 12-gauge bean bag shotgun against Mr. Wright?

A.   Yes.

Q.   And is it your understanding that Deputy Jones deployed the bean bag shotgun twice at Mr. Wright?

A.   Yes.

Q.   And is it your understanding that Deputy Jones deployed two drag stabilized bean bag munitions from the bean bag shotgun at Mr. Wright?

A.   Yes.  They are the Def Tech 12-gauge drag stabilized rounds.

Q.   And what is a drag stabilized bean bag round?

A.   It's sometimes referred as a sock round.  It's a fabric bag that contains some lead shot.  And it is played into a 12-gauge shotgun hull, and fired from a standard 12-gauge shotgun that's usually designated as a less lethal patrol weapon.

Q.   And I see that in your report you have a chart from POST listing a subject's level of resistance and the possible appropriate force and response.  Pursuant

Kenneth Hobbs

to police practices and training, at what level of resistance would it be acceptable to deploy the bean bag shotgun?

A.    Depending on what the suspect is doing, but generally, it would be an intermediate force, generally, a suspect who is combative, perhaps assaultive, in order to gain compliance.  Or he might be passively resistive, but armed with a weapon.

Q.    Do you know, from your review of the materials, what the optimal range for deployment of a drag stabilized bean bag munition is from a bean bag shotgun?

A.    Defense Technology recommends 20 to about 60 feet.  I believe that the San Bernardino Sheriff's Department, in their training, they recommend 20 to about 50 feet is optimal.

Q.    And when you say "defense technology," are you referring to the manufacturer of the bean bag munition?

A.    Yes.  Yes.  The rounds will travel far than 50, 60 feet.  It includes velocity.  The closer the distance, the more energy they transfer to the intended target.

Q.    And you referred to San Bernardino's recommendation.  So it your understanding that the San Bernardino Sheriff's Department also has policies in place regarding the deployment of the bean bag shotgun?

James Wright v. County of San Bernardino, et al.
Focus Litigation Solutions

Page: 17

A.   Yes; and they have training to that.

Q.   Do you know if the San Bernardino Sheriffs' Department policies have any restrictions on where on the body an officer can target with the bean bag shotgun?

A.   I believe they do, yes.

Q.   And what are the use restrictions?

A.   Generally, that would be the head, the neck, the check, groin, those areas, unless deadly force would be justifiable.

Q.   So then if I'm understanding correctly, the San Bernardino Sheriffs' Department policy is essentially -- say not to target the head, neck, chest or groin with the bean bag shotgun, unless deadly force is justified?

A.   Yes.

Q.   When you reviewed the materials in this case to form your opinions, did you review the deposition transcript of Deputy Deshaun Jones?

A.   I did.

Q.   Did you know note that Deputy Jones testified that he was trained that he should not deploy the bean bag shotgun at less than 20 feet because, in doing so, could cause serious injury or death?

A.   Yes.

Q.   And is that training consistent with generally

James Wright v. County of San Bernardino, et al.
Focus Litigation Solutions

Page: 18

accepted police practices and policies?

A.    That's a guideline, yes.  In my experience, I see them quite frequently utilized at much less than 20 feet.

Q.    In your review of the materials, did you also reviewed deposition transcript of Deputy Garrett Vairn?

A.    I did.

Q.    Did you notice that Deputy Vairn testified that he was trained that there must be an immediate threat of death or serious bodily injury present in order to deploy the bean bag shotgun at less than 20 feet?

A.    Yes.

Q.    And is that training consistent with generally accepted police practices and policies?

A.    Yes.

Q.    Okay.  I think we can go now into some of your opinions.  So I want to ask you some questions regarding background information of the incident.

From your review of the materials, is it your understanding that the deputies did not have any information that Mr. Wright had committed any violent crime?

A.    I don't know of the violent crimes.  I believe there was indication that there was an armed and dangerous notation on one of the felony wants.  That one

Kenneth Hubbs

Q.    Sure.

A.    Okay.  So -- okay.  Yeah, it starts on page 14. The basis of my opinions would be everything from page 14, all the way to the next opinion.  So it would be quite a bit in there.  Is there anything specific you'd like to ask?

Q.    I'll go into them.  Thank you, Mr. Hubbs.

When you say "potentially lethal force," what do you mean by that?

A.    Force that has a probability or a high probability of causing a serious bodily injury or death.

Q.    And from your review of the materials, did Deputy Jones use potentially lethal force in this case?

A.    I think when he fired the very first bean bag, he was firing that to prevent serious bodily injury or death to another deputy who was potentially in the path of the vehicle that Mr. Wright was attempting to drive.

Q.    And what, from your review of the materials, leads you to believe that the firing of the first bean bag round was a potentially lethal force?

A.    I don't believe that it was potentially lethal. I believe that Deputy Jones felt that lethal force would have been reasonable to prevent serious bodily injury or death to Deputy Stanley.

Q.    So then when you say the "use of less lethal"

James Wright v. County of San Bernardino, et al.
Focus Litigation Solutions

Page: 21

and "potentially lethal force" by Deputy Jones, what do you mean by "potentially lethal force"?

A.   The firing from a distance closer than their policy would state, and with the intent of stopping what would be the possible serious bodily injury or death to another deputy.

Q.   And you say firing from less than a distance that their policy would state, and that distance would be 20 to 50 feet; is that correct?

A.   Yes, I believe Deputy Jones felt he was less than 20 feet when he fired the first bean bag.

Q.   From your review of the depositions of Deputy Jones, Deputy Vairn, and Deputy Stanley, did you know that all three deputies who were on scene at the time the pursuit terminated stated in their deposition that, after Mr. Wright's vehicle came to a stop, it was all three of their beliefs that the vehicle was disabled?

A.   Well --

MR. SOUTHCOTT:  Objection.  Compound.

THE WITNESS:  The word "disabled" is used, but it was stopped.  But there was no question that, in my mind, that he was attempting to continue that vehicle to move either forward or rearward.  And, fortunately, the vehicle did not move and pose a threat to anyone else.

BY MS. LE:

I wouldn't necessarily call it a de-escalation technique. And it wouldn't have been one of the very first things to do, to go hands on. In a high-risk vehicle stop, you try and first gain compliance from the occupants of the vehicle and try and get them to surrender. And that's what they attempted to do as part of the de-escalation strategies that they began with.

Q. If a person was not complying with commands and was not surrendering, could the officers have approached the vehicle and just gone hands on with Mr. Wright?

A. The deputies could have done a wide array of things. They would have multiple choices and discretion on how to proceed, once they're going to try and apprehend the suspect.

Q. Didn't we previously discuss that one of the considerations in apprehending a suspect is to try to use as minimal force as possible?

A. And that will be based on the suspect. It could be based on the suspect's actions and level of resistance or willingness to cooperate and comply.

Q. And under these circumstances where Mr. Wright was not complying with commands, and was not surrendering, could the deputies have approached the vehicle and gone hands on with him?

MR. SOUTHCOTT: Objection. Incomplete

hypothetical.  Asked and answered.

THE WITNESS:  Those are techniques they could have used at some point.  There's a variety of concepts they would probably try and initiate before that.

Q.  And what are those concepts?

A.  Again, first off, trying to gain compliance of the individual.  Trying to get him to surrender.  Trying to talk him out of the vehicle, if they can.  If they can gain a rapport, gain a positioning of tactical advantage, positions where you can see into the vehicle.  Any -- I believe he was rolling the driver side window up and down at some points.  When the window was down, I think the communication was a little better.  When the window was up, the communication was probably less effective.  Breaking out the passenger side window provided for some better view inside the vehicle.  In the video, I initially thought the windows may have been tinted because, from the helicopter video, I didn't have a good view to see through the glass.  Deputies reported and testified they were able to see in through some of the glass of the windows.  But once the passenger side door window was broken out, his view of Mr. Wright would have been much more clear.

Q.  So under the circumstances and facts of this case, could one of the alternatives to deploying the

STATE OF CALIFORNIA)
                                ) ss:
COUNTY OF BUTTE       )

        I, KIMBERLY E. D'URSO, do hereby certify:

        That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

        That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

        That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

        Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

        That I am a certified stenographic reporter and a disinterested person to the said action;

        IN WITNESS WHEREOF, I have hereunder subscribed my hand this 8th day of March, 2026.

_____

KIMBERLY D'URSO, CSR NO. 11372, RPR